OPINION
{¶ 1} Appellant, David J. Jenkins, appeals from the judgment entry of the Trumbull County Court of Common Pleas convicting him, after a trial by jury, of murder. For the reasons set forth below, we affirm the verdict and judgment of conviction.
 {¶ 2} Appellant and his wife, Deana Jenkins, had been experiencing marital problems for some time. By May 20, 2004, Deana had told her friends Bernadette McElroy, Toni Heller, Neil Heller, Karen Osborne, Linda Merrell, Terri Harvey, and Carol *Page 2 
Brown that she wanted to leave appellant and was trying to save enough money to rent her own apartment. Many of her friends were aware that Deana had originally planned to wait for the couple's daughter, Desirae, to graduate from high school in the spring of 2005. However, Deana decided she could no longer postpone her departure. She had told her friends she was going to leave once Desirae completed her junior year in the spring of 2004. Appellant ultimately became aware of Deana's plans on his own and communicated his awareness to the couple's mutual friends Toni Heller and Pierre Osborne. Appellant had also explained to the couple's adult son, Durrell, he and Deana may separate.
 {¶ 3} On the morning of May 20, 2004, Deana reported to her job at the Trumbull County Child Support Office. Appellant, an associate pastor at the New Jerusalem Fellowship Church, basketball coach, and a house painter, drove Desirae to school. Appellant was scheduled to offer the invocation and benediction at the Kiwanis Club's Scholastics Achievement Banquet that evening. However, between 10:30 a.m. and 11:30 a.m., appellant phoned Jan Vaughn, a fellow Kiwanis Club member and organizer of the event. Appellant explained he was unable to attend the banquet due to a "family emergency." According to Vaughn, appellant stated his nephew had been badly beaten and therefore appellant needed to be with his family.
 {¶ 4} On the same morning, appellant visited his niece, Terri Harvey, at her place of employment, Famous Hair, in Warren, Ohio. Terri had been at Appellant's and Deana's home the previous evening conversing with Deana. Appellant greeted Terri and inquired into the substance of the conversation Terri had with Deana. Appellant *Page 3 
indicated their conversation and/or Terri's visit prevented him from having sex with Deana.
 {¶ 5} Later, between 2:00 p.m. and 3:00 p.m., appellant visited the Renaissance Place in Warren where he encountered two friends, Toni and Neil Heller. In the past, both Toni and Neil had helped Deana address and work through her marital problems. Appellant, aware of Toni's and Neil's influence, confided that he and Deana had made love the night before and thanked them for helping him "salvage their marriage."
 {¶ 6} That afternoon, Desirae finished school around 2:00 p.m. She came home and fell asleep until 5:00 p.m. when she was awoken by appellant. Appellant told Desirae they were going to the mall to "look for basketball stuff, for the girl's [sic] basketball team." Durrell had planned to use appellant's green Ford Explorer to apply for summer jobs that evening, and so Durrell was going to drive appellant and Desirae to the home of appellant's parents where appellant could borrow his father's pick-up truck. Deana arrived home as the three were leaving. They arrived at the residence of appellant's parents and Durrell went to fill-out job applications. Once Durrell left, appellant suddenly changed the shopping plans he made with Desirae. He stated he had to attend a meeting at the Rebecca Williams Community Center and left in his father's pick-up truck, without Desirae, at sometime near 5:30 p.m. Desirae recalled appellant was dressed in a dark blue shirt, yellow and blue jogging pants, and black tennis shoes.
 {¶ 7} In lieu of going to the community center, appellant returned home. Around 5:45 p.m., Bernadette McElroy stopped at the Jenkins' residence to drop off CDs for Durrell to copy. Bernadette knocked on the door and, when appellant answered the *Page 4 
door, she asked to speak with Deana. Appellant told Bernadette that he and Deana were having a "family discussion." Bernadette noticed appellant was wearing "painter pants and a dress jersey top." After a brief exchange, Bernadette gave the CDs to appellant and began to walk away. As Bernadette was returning to her car, Deana peeked out of a window and asked if Durrell could use her as a job reference. Bernadette testified she left the Jenkins' residence at approximately 5:55 p.m.
 {¶ 8} Shortly after Bernadette left, at 6:24 p.m., Deana made a panicked call to her friend Toni Heller. At the time, Toni was in Austintown Township, Mahoning County, watching her son at a track meet. Deana sounded strained and stated she needed someone at her home immediately. Before Toni could respond, Deana repeated her muffled entreaty and the phone went dead. Toni testified Deana sounded as though she could not breathe.
 {¶ 9} Toni left the track meet en route to the Jenkins' residence in Warren. At 6:27 p.m., she frantically called Karen Osborne, a mutual friend. Karen testified "[Toni] said she received the phone call and Deana sounded as if she could hardly breathe and said someone needed to get to the house right away." Karen's telephone records revealed she tried to contact Deana's cell phone at 6:31 p.m. but received no response. Toni also called her husband, Neil Heller, a Warren City Firefighter, who was on duty at the Atlantic Street Fire Station. Toni reached Neil shortly after 6:30 p.m. and asked him to go to Deana's aid. Another mutual friend, Carol Brown had been notified of the emergency call and, in turn, Carol called Bernadette. Bernadette, who was shopping at the time, left immediately and rushed to Deana's home. *Page 5 
 {¶ 10} When Toni arrived back in Warren, Neil and Karen were already at the Jenkins' residence. Based on her phone records, Karen estimated she arrived at 6:40 p.m. The only car in the driveway was Deana's distinct BMW. Karen knocked on the door but received no response. She tried to open the front and back doors but both were locked. Toni was ultimately able to enter the home through an open bathroom window after which she unlocked the back door and Karen and Neil entered. While inside, Neil searched the basement while Karen and Toni looked upstairs. The house was ostensibly empty. The parties did not thoroughly go through all aspects of the home, but canvassed the main living areas of the house. During their search of the master bedroom, Toni noticed Deana's white purse and a pair of her shoes on the bed.
 {¶ 11} In the meantime, appellant had again visited the Rebecca Williams Community Center. At 7:02 p.m., a program coordinator at the center, Alfie Burch, was locking the building when he noticed appellant sitting in a white pick-up truck. Appellant asked Mr. Burch if he had seen one Thurston Winbush, another employee of the community center. Mr. Burch indicated he was uncertain of Winbush's whereabouts and appellant quickly left the Center. Mr. Burch stated that appellant did not exit the truck and appeared to be in a rush. The men spoke for approximately 20 to 30 seconds.
 {¶ 12} Appellant returned to his parents' home sometime after 7:00 p.m. to retrieve Desirae. When he arrived, Desirae testified appellant appeared very nervous, he was shaking and sweaty, as though "somebody just poured water on his shirt, or as if he were playing basketball, it was just soaked and just sweat dripping." Desirae recalled May 20, 2004 was not a hot day and she was not sweating. She further *Page 6 
noticed her father had a scratch on his nose that was not there when he dropped her off at 5:30 p.m. and was wearing new white sneakers which had no laces. Appellant and Desirae drove toward the Eastwood Mall but did not reach their destination. Instead, they stopped at Burlington Coats on Route 422. In doing so, appellant sent Desirae into the store, and told her not to buy basketball apparel, but to look for clothes for herself. While Desirae was in the store, appellant encountered an old friend, Jane Horne. Ms. Horne stated she and appellant typically have lengthy, interesting conversations. However, on that day, their conversation was brief and clipped. Ms. Horne noticed appellant was "sweating profusely" and wiped his face with his shirt three times during their brief exchange. After this conversation, appellant went into Burlington and paid for Desirae's clothes. According to the sales receipt, they left the store at 7:39 p.m.
 {¶ 13} Appellant and Desirae returned to the home of appellant's father and mother. Once they arrived, Terri Harvey, appellant's niece, communicated there was an emergency involving Deana. Appellant and Desirae left and returned to the Jenkins' residence. Upon arriving, appellant sent Desirae to search the downstairs while he checked upstairs. As appellant and Desirae were leaving the home, they encountered Karen Osborne. Karen told appellant about Deana's phone call to Toni. Appellant professed that Deana needed to be found and suggested they all should leave the house and search for her. Karen pointed out that someone should stay at the house in the event Deana returns or someone else stopped by the home. Appellant vehemently disagreed and advised that everybody had "to leave and go find her."
 {¶ 14} Appellant returned to his truck and appeared to leave to search for Deana. As Karen drove away, she observed Toni coming down the street. She waited and the *Page 7 
two women conversed about the situation. During the conversation, she noticed appellant had stopped, turned the truck around, and returned to the house. Toni and Karen surreptitiously followed appellant. As they approached the driveway, Karen heard a slamming noise coming from behind of the house. Appellant appeared and asked "what are you doing back here for?" As the women walked toward the backyard, appellant told them he already investigated the area and found nothing. Toni and Karen both asked appellant if they could look through the house again; however, appellant assured them he had already inspected the entire house, flatly remarking "she ain't in the house."
 {¶ 15} As they stood in the driveway, Toni peered into a garbage can and noticed Deana's purse. This was the same purse Deana took to work that morning and the same purse Toni had seen in the master bedroom when she entered the house earlier that evening. Deana's cell phone, keys, and wallet were in the purse. Toni and Karen then entered the garage where they observed a large plastic tarp spread over the floor. Karen, like Desirae and Jane, noticed appellant was perspiring heavily.
 {¶ 16} Shortly thereafter, Bernadette arrived followed by Durrell, who was with Carol. Durrell let everyone in the house and the search commenced anew. Durrell first searched his parents' room and then his sister's. Once he opened Desirae's closet, he discovered Deana, beaten and unconscious. Toni rushed into the room as Durrell yelled for his father. Deana fell from the closet to the floor whereupon Karen and Toni commenced CPR. The individuals observed Deana had various abrasions, bruises, and red marks on her face and neck; she had blood in her nostrils and her front tooth was chipped. They noticed Deana was clothed; however, her shirt had mismatched *Page 8 
buttons and her skirt was askew and pulled up unusually high. Although Deana's legs were cold to the touch, her upper body was warm. As the women tried to resuscitate Deana, appellant came into the room and violently knocked perfume bottles off a nearby dresser some of which landed on Deana. Neil eventually arrived and continued aggressive CPR. Neil noticed a scratch on appellant's nose that he did not see earlier when they spoke that day.
 {¶ 17} Paramedics arrived and appellant told them Deana suffered from a medical condition that caused her throat to close. This proved to be false; Deana had no such condition and was in generally good health. After trying unsuccessfully for 16 minutes to resuscitate her, the paramedics took Deana to the hospital where she was pronounced dead. After an autopsy, Dr. Humphrey Germaniuk, the forensic pathologist for Trumbull County, concluded Deana died from strangulation between 6:30 p.m. and 8:30 p.m.
 {¶ 18} While at the hospital, Detective Geoffrey Fusco attempted to interview appellant, but he was virtually unintelligible. Appellant simply reiterated that he and Deana had made love that day. After investigating the crime scene and the Jenkins' home, police officers could find no signs of forced entry.
 {¶ 19} In the weeks following Deana's death, appellant provided the police with certain theories regarding what he believed happened on May 20, 2004. For instance, he asserted Deana had been the victim of stalking or threats at work; however, a search of Deana's work e-mail revealed nothing unusual or threatening. Further, Lt. Joe Marhulik reviewed old incident reports and canvassed the neighborhood after the homicide, but found no evidence of stalkers or suspicious persons. *Page 9 
 {¶ 20} DNA samples were collected from Deana, appellant, and one William Fambro. The samples were analyzed by Brenda Gerardi, forensic scientist with the Ohio Bureau of Criminal Identification and Investigation. She found semen in the victim's underwear and skirt. The non-sperm DNA was consistent with Deana's DNA and the sperm DNA was consistent with appellant's. DNA of both appellant and Deana was recovered from duct tape which was found in the same garbage can in which Toni found Deana's purse. Hair strands stuck to the duct tape matched Deana's DNA.
 {¶ 21} Shawn Weiss, associate director for the forensic identity department at Laboratory Corporation of America Holdings, analyzed fingernail clippings from Deana's hands. After analyzing the fingernail clippings he found DNA under the right hand clippings. Weiss concluded he could not rule out appellant or appellant's relatives as a source of this DNA.
 {¶ 22} On April 1, 2005, appellant was indicted on one count of murder, in violation of R.C. 2903.02(A) and (D). Appellant pleaded not guilty and was released on a personal recognizance bond. On February 21, 2006, the state filed a notice of intent to use statements of the deceased. In response, appellant filed two motions in limine objecting to the use of the statements. The trial court overruled appellant's motions and, on March 7, 2005, the matter proceeded to jury trial. Appellant was found guilty and, on March 20, 2006, appellant was sentenced to a term of fifteen years to life pursuant to R.C.2929.02(B). Appellant now appeals and assigns four errors for our review. Appellant's first assignment of error alleges:
 {¶ 23} "The trial [court] erred and abused its discretion by permitting numerous witnesses to testify concerning the victim's intention to divorce the appellant." *Page 10 
 {¶ 24} Under his first assignment of error, appellant asserts the trial court abused its discretion when it allowed hearsay testimony from third parties for which the rules of evidence do not provide an exception. Appellant challenges the admissibility of testimony from various third parties regarding Deana's intentions to leave and/or divorce appellant. As we believe the evidence was demonstrative of Deana's "then existing" intention or plans, we disagree.
 {¶ 25} The admission or exclusion of evidence rests within the sound discretion of the trial court. State v. Stackhouse, 11th Dist. No. 2002-P-0057, 2003-Ohio-1980, at ¶ 19. An appellate court will not interfere with a trial court's evidentiary ruling absent an abuse of discretion. State v. Benson, 11th Dist. No. 2001-P-0086, 2002-Ohio-6942, at ¶ 7. An abuse of discretion connotes an attitude which is arbitrary, unreasonable, or unconscionable. Blakemore v Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 26} At trial, Bernadette McElroy, Toni Heller, Neil Heller, Karen Osborne, Terri Harvey, Carol Brown, and Linda Merrell each testified that Deana had disclosed, before May 20, 2004, that she intended to leave appellant. Through the collective testimony of these witnesses, the jury heard that originally, Deana had planned to stay with appellant until Desirae graduated from high school in the spring of 2005. However, prior to her death, she had changed her mind and decided to leave at the end of Desirae's junior year, i.e., the spring of 2004. Furthermore, Deana had communicated that she had been saving money to get an apartment. Finally, Toni and Bernadette testified that Deana told them she had disclosed her plans to appellant on the evening of May 19, 2004. *Page 11 
 {¶ 27} Appellant objected to the foregoing statements via a motion in limine. Appellant argued any of the victim's prior statements testified to by a third party were impermissible hearsay and must be excluded. In response, the state argued the statements were admissible by operation of either Evid.R. 803(3) or Evid.R. 804(B)(6). Evid.R. 803(3), the "then existing mental, emotional, or physical condition" exception to the hearsay rule, does not require the declarant to be unavailable. Evid.R. 804(B)(6), the "forfeiture by wrongdoing" exception, requires unavailability.
 {¶ 28} After a brief hearing on the issue, the trial court made the following ruling on the record:
 {¶ 29} "All right, I guess I am going to address it first primarily as an exception to the hearsay rule under 803(3), the state of mind exception. And it's the opinion of this Court based on what this particular testimony is suppose[d] to be about are intentions and intentions are one of the items that is permissible under 803(3), and future intentions are clearly established and it's clearly rooted in that particular exception, and so long as the testimony turns out to be in that nature, then I believe it is an exception to the hearsay rule. And the Court's position is that pursuant to 803(3), it's admissible, and the motion in limine is overruled."
 {¶ 30} As the trial court based its ruling on the exception set forth under Evid.R. 803(3), we shall assess whether this ruling is arbitrary or otherwise unreasonable.
 {¶ 31} Evid.R. 803(3) allows hearsay testimony that relates to "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), * * *." *Page 12 
 {¶ 32} Clearly, Deana's statements reflect her "then existing state of mind" in the form of her intentions and plans as they pertained to the manner she was going to address her marital problems. Initially, she did not intend on leaving appellant before Desirae graduated. Later, she changed her plans, and intended to leave after Desirae's junior year. To accomplish her plans, she had been saving money in order to rent an apartment. We believe the hearsay statements fall within the exception set forth in Evid.R. 803(3).
 {¶ 33} This conclusion is supported by strong authority. In State v.O'Neal, 87 Ohio St.3d 402, 2000-Ohio-449, the defendant had a history of tormenting and physically abusing his wife, Carol. He eventually shot and killed her. He was tried and convicted of capital murder. During the trial, various statements about her plans and intentions relating to her relationship with the defendant were admitted through third party testimony. The Supreme Court of Ohio determined:
 {¶ 34} "Carol's statements that she was feeling stressed and was afraid of appellant were relevant to prove her intent to end the marriage. These statements were properly admitted as evidence under Evid.R. 803(3), which permits hearsay evidence of a declarant's `then existing state of mind, emotion, sensation * * * (such as intent, plan, motive, design, mental feeling [or] pain).' To be sure, `testimony of state-of-mind witnesses, that the victim was fearful and apprehensive [is] not inadmissible hearsay and [is] properly admitted.' * * * In addition, statements about Carol's plans to separate and end the marriage were also admissible under Evid.R. 803(3)." O'Neal, supra, at 411-412. (Citations omitted.) *Page 13 
 {¶ 35} Further, in State v. Sage (1987), 31 Ohio St.3d 173, the defendant argued he and the victim entered a suicide pact. However, the state presented evidence that the victim decided to terminate her relationship with the defendant and thus committing suicide would be inconsistent with this intention. Further, the victim had expressed her plans for the future to college friends, which was inconsistent with one contemplating suicide. The court held that this testimony was admissible with respect to the victim's intent under Evid. R. 803(3).
 {¶ 36} The statements at issue fundamentally mirror those deemed admissible in both O'Neal and Sage. We therefore hold the trial court did not abuse its discretion and the statements at issue were properly admitted under Evid.R. 803(3).
 {¶ 37} The foregoing conclusion notwithstanding, various witnesses testified that appellant had specifically communicated his awareness of Deana's intentions to end the marriage. Toni Heller testified appellant had discussed his knowledge of Deana's plan to leave him and asked her to "help him save his marriage." Pierre Osborne, one of appellant's best friends, testified appellant confided in him regarding the ongoing problems he was having with the marriage. Mr. Osborne testified he and appellant talked "quite a bit" about appellant's marriage and, during many of these discussions, appellant disclosed his awareness that Deana was contemplating leaving him. Finally, Durrell Jenkins testified appellant had disclosed to him the couple might separate.
 {¶ 38} Admissions by a party opponent are not hearsay and are admissible if they meet the criteria set forth under Evid.R. 801(D)(2).State v. Hamilton, 11th Dist. No. 2000-L-003, 2002-Ohio-1681, 2002 Ohio App. LEXIS 1659, *13. Here, appellant made the statements; they manifest appellant's belief that Deana desired to leave; and *Page 14 
the statements were offered against him at trial. The statements therefore meet the requirements of a party admission under both Evid.R. 801(D)(2)(a) and (b) and are thus admissible.[1]
 {¶ 39} With this in mind, we conclude the trial court did not err in admitting the third-party testimony regarding Deana's plans pursuant to Evid.R. 803(3). However, even had it erred in admitting the testimony, any error would be harmless because evidence of Deana's intentions and/or the couple's marital problems was admissible through appellant's admissions pursuant to Evid. R. 801(D)(2).
 {¶ 40} Appellant's first assignment of error lacks merit.
 {¶ 41} Appellant's second assignment of error argues:
 {¶ 42} "The trial [court] erred and abused its discretion by not granting appellant's motion for a mistrial because the audience was disruptive during the trial."
 {¶ 43} Under his second assignment of error, appellant contends the trial court abused its discretion by not protecting the jury from intimidation by spectators during the trial. Appellant alleges jury intimidation and harassment, and maintains spectators were commenting upon testimony to his prejudice. Appellant concludes the trial court should have granted his motion for mistrial.
 {¶ 44} The decision to grant or deny a mistrial rests within the sound discretion of the trial court. State v. Gross, 11th Dist. No. 2004-A-0036, 2005-Ohio-5765, at ¶ 29. A reviewing court will not disturb a trial court's decision absent an abuse of discretion. State v.Treesh, 90 Ohio St.3d 460, 480, 2001-Ohio-4. A court should be circumspect *Page 15 
when considering a motion for mistrial and grant the motion only when a fair trial is no longer possible. Id.
 {¶ 45} During Bernadette McElroy's testimony, defense counsel asked the court to instruct certain spectators to "behave themselves." In response, the court made the following statement:
 {¶ 46} "If anybody is making any kind of comments, I am going to ask anybody, and I don't know who it is, but if anybody is, I am going to ask you to cease doing that or else you will be removed from the Courtroom."
 {¶ 47} No additional complaints were made on record; however, shortly after this warning, the court took a brief recess. After the recess, the court gave the spectators the following rebuke:
 {¶ 48} "All right, before we start back up with direct examination, it's come to my attention, once again, from a variety of sources, that there are people in here, and I can't tell who it is because I am too busy trying to listen to the evidence, that are either making remarks or making themselves heard in some other fashion, and it's disruptive to the Court and it's disruptive to the jurors. If somebody does that one more time and I find out who it is, and it's my understanding that it's not family members on either side, you will be asked to be excused. And if it's distracting to a certain degree, some of you may have a chance to taste the food at the County Jail, so do not do it."
 {¶ 49} First, in order for a court to grant or deny a motion for a mistrial, a party must so move the court. We find no evidence in the record indicating defense counsel moved for a mistrial based upon the alleged disruptions. As a result, appellant has waived this issue on appeal. State v. Joseph, 73 Ohio St.3d 450, 455, 1995-Ohio-288. *Page 16 
However, even had defense counsel properly moved for a mistrial, we believe such relief would be unwarranted. Neither defense counsel's initial request nor the court's admonitions indicate the spectators were attempting to intimidate or otherwise harass the jury. Furthermore, if comments were being made, the record does not reflect their content. We cannot consider the propriety of comments when we have no way of knowing their nature and substance. There is insufficient evidence in the record to support appellant's exhortation that a mistrial should have been granted. We believe the comments or disruptions were minor and did not compromise the fairness of the judicial process.
 {¶ 50} Appellant's second assignment of error lacks merit.
 {¶ 51} Appellant's third assignment of error asserts:
 {¶ 52} "The trial [court] erred and abused its discretion and violated appellant's constitutional right to a fair trial by allowing appellee in its closing argument to imply that appellant's silence was an inference of guilt."
 {¶ 53} Under his third assignment of error, appellant argues the trial court erred by allowing the state, during closing argument, to pose rhetorical questions. In appellant's view, the comments were improper because they asked the jury to infer guilt through the assertion of his right to remain silent. We disagree.
 {¶ 54} "[A] prosecutor has wide latitude in closing arguments. As long as an improper comment is isolated and does not deprive the defendant of a fair trial, it will not constitute reversible error. * * * The test for prosecutorial misconduct is whether remarks are improper and, if so, whether they prejudicially affected substantial rights of the accused.'"State v. Bleasdale (Sept. 6, 1996), 11th Dist. No. 95-A-0047, *Page 17 
1996 Ohio App. LEXIS 3876, *6-*7, quoting State v. Lott (1990), 51 Ohio St.3d 160,165. The closing argument must be considered in its totality to determine whether it was prejudicial. State v. Vanek, 11th Dist. No. 2002-L-130, 2003-Ohio-6957, at ¶ 34.
 {¶ 55} Upon review of the state's closing argument, we fail to discern any statement or suggestion that appellant's silence should be used as evidence of his guilt. During his closing argument, the prosecutor recapitulated the evidence and testimony of the state's witnesses. In doing so, the prosecutor pointed out that there was no evidence to support appellant's version of the story.
 {¶ 56} The substance of appellant's defense was related to the court via the testimony of Pierre Osborne. Mr. Osborne testified that on June 17, 2004, several weeks after Deana's death, he met with appellant. During this meeting, appellant discussed his whereabouts on May 20, 2004. In particular, appellant asserted he was driving his father's pick-up truck in his neighborhood when he observed several children throwing a football. Appellant stated he approached them, threw the ball with them, and asked the children if they would pass out fliers for his painting business. The children acceded and appellant alleged he returned to his home to retrieve the fliers. When he arrived, Deana was home and they had sexual intercourse. Afterwards, there was a knock at the door that appellant answered. Bernadette McElroy had stopped at the Jenkins' home to speak with Deana. After Bernadette left, appellant asserted he returned to deliver the fliers to the children but they were no longer there. According to Pierre Osborne, appellant then alleged he and Desirae went shopping. After he left home, appellant claimed he never saw Deana alive again.
 {¶ 57} During closing, the prosecutor stated: *Page 18 
 {¶ 58} "Now, we heard from various witnesses that this Defendant played basketball or football with some of the neighborhood kids. What witness came here and said, oh, yeah, I played with David Jenkins. What witness in his own neighborhood —"
 {¶ 59} Defense counsel immediately objected asserting that the prosecutor had "done this five times now." The court requested both counsel to approach and, after a brief discussion, overruled the objection.
 {¶ 60} We agree with the trial court. Here, the prosecutor was simply commenting upon the failure of the defense to offer evidence in support of its theory of the case. Such comments are permissible within the context of closing argument. See State v. demons (1998),82 Ohio St.3d 438, 452; see, also, State v. Williams (1986), 23 Ohio St.3d 16, 19-20;State v. Bies (1996), 74 Ohio St.3d 320, 326. The prosecutor's comment in no way relates to appellant's assertion of his right to remain silent. At most, the prosecutor's statement is a comment on the silence of a potential witness who may have supported appellant's theory. Even when viewed in this regard, the Supreme Court has held that prosecutor may properly comment on the silence of a witness other than the accused.State v. D'Ambrosio (1993), 67 Ohio St.3d 185, 193; See, also, State v. Petro (1948), 148 Ohio St. 473, 498. The prosecutor's comment was directed at the adequacy of appellant's version of events, and was therefore permissible within the framework of closing argument.
 {¶ 61} Appellant's third assignment of error is without merit.
 {¶ 62} Appellant's fourth and final assignment of error contends:
 {¶ 63} "The appellant's convictions are against the manifest weight of the evidence." *Page 19 
 {¶ 64} When reviewing the weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. State v. Martin (1983), 20 Ohio App.3d 172,175. The discretionary power to grant a new trial should be exercised only in exceptional cases wherein the evidence weighs heavily against the conviction. Id.
 {¶ 65} Appellant's argument is primarily focused upon certain alleged inconsistencies in the evidence offered by the state. Appellant first points out that there were inconsistencies in the evidence regarding his attire on the day of Deana's death. Appellant asserts that Desirae testified appellant was wearing a running suit with black shoes when he dropped her off at his parents' house at approximately 5:30 p.m. When he returned, around 7:00 p.m., appellant was wearing the same running suit but with new white shoes which were unlaced. Alternatively, Bernadette McElroy testified that appellant was wearing painter's pants and a "dress jersey" when she spoke with him between 5:45 p.m. and 5:55 p.m. Appellant asserts "[n]othing in the [r]ecord indicated a reason for this discrepancy and, further, no evidence concerning clothing actually implicated [a]ppellant in the crime charged, or any crime for that matter."
 {¶ 66} First, even if the different testimony regarding appellant's clothing were viewed as an inconsistency, we do not believe this would suffice to render the conviction against the manifest weight of the evidence. The evidence, while primarily circumstantial, provides clear, consistent support for the jury's verdict, regardless of the clothing testimony. *Page 20 
 {¶ 67} That said, we believe the discrepancy identified by appellant is not a true inconsistency. Specifically, the prosecution's theory involved appellant leaving Desirae at her grandparents' house and returning home to murder Deana. Given this basic construction, one reasonable inference that can be drawn from the testimony of Desirae and Bernadette is appellant changed his clothes to commit the crime. After the crime was committed, appellant put his jogging suit back on, replaced his shoes, then retrieved Desirae to go shopping. The testimony of Desirae and Bernadette regarding appellant's attire is actually consistent with the prosecution's version of events and therefore rationally explicable given the evidence. As a reasonable trier of fact could resolve the discrepancy by recourse to the evidence of the surrounding facts and circumstances put forth by the state, it is not against, but supports the conviction.
 {¶ 68} Next, appellant points out some witnesses observed a scratch on his nose while others did not. First, the fact that some witnesses either did not recall the scratch or overlooked it does not mean those that viewed it were mistaken. A review of the record indicates Neil Heller, Terri Harvey, Linda Merrell, and appellant's daughter Desirae noticed the scratch on appellant's nose. Of these individuals, Neil and Desirae testified the scratch was not on appellant's nose earlier in the day. To wit, Neil had spoke with appellant around 2:00 p.m. on May 20, 2004, and testified appellant did not have a scratch during their conversation. Furthermore, and perhaps more significantly, Desirae testified, at 5:30 p.m., when appellant dropped her off at her grandparents' house, appellant did not have the scratch; however, around 7:00 p.m., when he returned, the scratch was there. Four witnesses, including his daughter, observed the scratch on appellant's nose. This evidence, in conjunction with the identification of *Page 21 
appellant's DNA on Deana's fingernail clippings, reasonably supports the state's theory. Although every witness who had encountered appellant on the night of May 20, 2004 did not comment on appellant's scratched nose, these omissions do not compromise appellant's conviction or shift the weight of the evidence in his favor.
 {¶ 69} Appellant next asserts that the evidence of Deana's alleged affairs with other men militates strongly against his conviction. Appellant's argument suggests that another person, perhaps a scorned paramour, could have murdered Deana. The record reveals no evidence that would credibly implicate another party in Deana's murder. The evidence put forth against appellant was credible and thorough. The fact that Deana may have had an affair (or affairs) has no impact upon the evidence supporting the conviction in this case.
 {¶ 70} Finally, appellant argues that the discovery of his DNA on Deana's clothes and fingernails does not necessarily mean he murdered Deana. Appellant aptly points out that such evidence would be consistent with his specific assertion he and Deana had sexual intercourse on the day of her murder. We do not disagree with appellant on this point. Because appellant and Deana were married and lived together, evidence of appellant's DNA could be on Deana and her clothes for any number of reasons. However, this argument fails to impugn the substantive force of the timeline and testimony relating to appellant's appearance, actions, and demeanor on May 20, 2004. Even if the DNA found its way onto Deana's fingernails by some legitimate and licit means, the overall weight of the evidence still supports the jury's verdict.
 {¶ 71} We acknowledge appellant's conviction was based largely upon circumstantial evidence. However, it is well-established that circumstantial and direct *Page 22 
evidence possess the same inherent probative value. State v. Jenks
(1991), 61 Ohio St.3d 259, 272. Simply because appellant's conviction was premised, in significant part, on circumstantial evidence does not affect the reliability of his conviction. Much of the testimony introduced by the state was corroborated by other witnesses or physical evidence. Furthermore, appellant did not argue any witnesses were biased or had a poor memory. To be sure, many of the state's witnesses were Deana's friends, but many also shared a friendship with appellant. Although appellant maintained his innocence, the state offered a competing view supported by detailed testimony from which a reasonable jury could infer appellant's guilt. Despite the difference in the parties' respective theories, the conviction does not stand contrary to the weight of the evidence merely because the jury found the state's version more trustworthy and reliable. State v. Beesler, 11th Dist. No. 2002-A-0011, 2003-Ohio-2814, at ¶ 22. After a careful and detailed review of the evidence, we hold appellant's conviction for murder is in accord with the manifest weight of the evidence. Appellant's fourth assignment of error is without merit.
 {¶ 72} For the reasons set forth above, appellant's four assignments of error are without merit and the judgment of conviction upon the jury verdict entered by the Trumbull County Court of Common Pleas is hereby affirmed.
MARY JANE TRAPP, J., MARY DeGENARO, J., Seventh Appellate District, sitting by assignment, concur.
[1] In relevant part, Evid R. 801(D)(2) permits the admission of a statement by a party opponent if it is offered against a party and is "(a) his own statement, in either his individual or a representative capacity, or (b) a statement of which he has manifested his adoption or belief in its truth * * *." *Page 1