OPINION *Page 2 
¶{1} Defendant-appellant Victor Peeples appeals from his felonious assault conviction entered in the Mahoning County Common Pleas Court. Appellant's main allegation is that the trial court admitted testimonial evidence in violation of the Confrontation Clause and that even if such evidence was not testimonial, it was inadmissible hearsay. Specifically, the state was permitted to present testimony of the victim's friend and the responding officer regarding a statement of the victim, who had recanted her allegations against appellant.
¶{2} Appellant also alleges the discriminatory use of a peremptory challenge, prosecutorial misconduct in closing arguments, denial of the right to impeach a witness and insufficient evidence of serious physical harm. For the following reasons, the judgment of the trial court is hereby affirmed.
 STATEMENT OF THE CASE ¶{3} Appellant was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(1), a second degree felony. This charge was based upon Sarah Williams's statement to police that appellant beat her. She testified to this effect at appellant's preliminary hearing. Before trial, Sarah changed her story and claimed that she was mad at appellant after discovering him with another woman and that it was actually this other woman who had injured her.
¶{4} At trial, the state presented the testimony of Roxanne Clark-Pless. She stated that Sarah was like a second mother to her. She explained that Sarah telephoned her on the morning of July 13, 2007. (Tr. 296). Sarah was upset, crying and emotional. (Tr. 297). Over objection, Roxanne testified that Sarah told her that appellant "beat her up real bad" that morning and in doing so, he broke her china cabinet. (Tr. 298, 300). Sarah told Roxanne that she was bleeding, she could not breathe and she had a headache. (Tr. 298). Roxanne also disclosed that Sarah said that she was waiting for the police to arrive and that she did not want appellant to come back. (Tr. 299). *Page 3 
 ¶{5} The next morning, Roxanne called to check on Sarah, but appellant answered the telephone and would not let her speak to Sarah. (Tr. 303). After some arguing, he told Roxanne that he knew where she lived. (Tr. 305). He hung up on Roxanne twice, at which point Roxanne called 911 to report her concern for Sarah. (Tr. 306).
¶{6} The state then presented the testimony of Officer Michael Walker of the Youngstown Police Department. He was dispatched to Sarah's house both days. On the first day, he arrived to find Sarah with a "busted lip" and a swollen face. She looked as if she had been in a fight and as though she had been crying; she also seemed afraid. (Tr. 327-328). Over objection, Officer Walker testified that Sarah said appellant hit her in the face more than once with his fist. (Tr. 328-329). She also expressed that she was afraid of appellant and feared he would beat her again if he knew about her call to the police. (Tr. 329).
¶{7} The next morning, Officer Walker responded to Roxanne's 911 call that she could not reach Sarah. (Tr. 330). Upon receiving no response to repeated knocking and announcing at Sarah's door, Officer Walker called his supervisor and procured back-up. (Tr. 331-332). After thirty minutes without response, they contacted the fire department in order to make a forced entry. Just before the forced entry attempt, Sarah opened the door. (Tr. 334). She appeared frightened, and she whispered that appellant was in the bathroom and that he had told her not to open the door. (Tr. 335-336).
¶{8} Officer Sonia Wilson was also present when Sarah opened the door on July 14. She stated that Sarah appeared shaken and extremely nervous; Sarah had red and watery eyes, and it was otherwise obvious that she had been crying. (Tr. 366). When Officer Wilson asked why she had refused to open the door, Sarah responded that appellant told her that he would kill her if she got out of bed. (Tr. 367). No objection was lodged to Officer's Wilson testimony.
¶{9} A detective also confirmed that Sarah opened the door looking terrified and that she whispered that appellant was in the bathroom. He noted that they then had to yell at appellant for a minute before he would exit the bathroom. (Tr. 390). Another detective testified that he spoke with Sarah as he was filing the charges *Page 4 
against appellant. He explained that Sarah was fearful of going forward with the charges. He noted that when he saw her at the preliminary hearing, she was frightened and shaking. She signed a medical release, and he took photographs of her which showed that she still had a black eye eleven days after the incident. (Tr. 396).
¶{10} The emergency room physician testified that he treated Sarah on July 13, 2007, due to injuries received when she was beaten by her boyfriend. (Tr. 424, 425). She had throbbing pain and swelling in various places. (Tr. 433). X-rays were taken of her thoracic spine and her left shoulder, and a CAT scan was taken of her face and head. (Tr. 427, 434-435). She suffered a fractured nose, a lacerated lip, contusions to the mid-spine, face and head, pain in her shoulder and abrasions on her body including her upper chest. (Tr. 426, 433, 438, 444).
¶{11} At that point, the state rested. The defense called Sarah Williams to the stand. She testified that appellant is her fiancée and they have been together seven years. She stated that on the morning she suffered her injuries, she was looking for appellant at the McGuffey Plaza and saw him kissing a woman named Tracey. (Tr. 517-518). She said that after some name-calling, Tracey punched her in the eye and lip causing her to fall to the ground. (Tr. 519-520). Once home, she called the police and stated that appellant beat her. (Tr. 524). After speaking to the police, she called an ambulance to take her to the hospital. (Tr. 526). Later, appellant asked for her forgiveness and stayed the night. (Tr. 533). At first, she denied telling Roxanne that appellant hit her, but she then admitted that she did tell Roxanne this version of events. (Tr. 536, 574).
¶{12} The state called Tracey Jordan in rebuttal. She testified that she dated appellant three or four years prior and that she had not seen him in years. (Tr. 593). She stated that she had never seen Sarah before, and she denied being in a fight on July 13, 2007. (Tr. 594). An attorney from the prosecutor's office then testified that when Sarah called her last, she reported that appellant did not abduct her, she acknowledged that she received her injuries from him, and she insisted that she forgave him. (Tr. 599-600). *Page 5 
 ¶{13} The jury was instructed on both felonious assault and the lesser included offense of assault. The jury found appellant guilty of felonious assault as charged. The court then sentenced appellant to five years in prison. Appellant filed timely notice of appeal.
 ASSIGNMENT OF ERROR NUMBER ONE ¶{14} Appellant's first assignment of error alleges:
¶{15} "THE TRIAL COURT ERRED IN DENYING APPELLANT PEEPLES' CRIM.R. 29 MOTION FOR ACQUITTAL AS THE STATE PRESENTED INSUFFICIENT ADMISSIBLE EVIDENCE AT THE END OF ITS CASE."
¶{16} Initially, we must correct appellant's misunderstanding of our review under this assignment. Appellant's sufficiency argument presented here is only based upon his claim that various pieces of evidence were inadmissible. He is under the impression that we determine whether any evidence was inadmissible and then review the sufficiency of theadmissible evidence. However, insufficient evidence requires reversal and dismissal, whereas admissibility problems only require reversal and remand for a new trial.
¶{17} It is well-established that the appellate court is to considerall of the testimony before the jury, whether or not it was properlyadmitted. State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 80, citing Lockhart v. Nelson (1988), 488 U.S. 33, 40-42, 109 S.Ct. 285, 102 L.Ed.2d 265. See, also, State v. Goff (1998), 82 Ohio St.3d 123, 138
(failing to use the word "admissible" before "evidence" in the standard sufficiency test). Thus, his sufficiency argument shall not be entertained under this assignment. (We reserve our sufficiency review of all evidence presented, whether admissible or not, for assignment of error number five, where appellant raises the lack of sufficient evidence to support the element of serious physical harm.)
¶{18} Appellant's main contention here is that three statements were presented in violation of the Confrontation Clause and/or constituted inadmissible hearsay: (1) Sarah's statements to Roxanne concerning the beating; (2) Roxanne's 911 call; (3) Sarah's statement to Officer Walker. We shall outline the law on the subject and then apply the pertinent provisions to each statement. *Page 6 
 ¶{19} The Sixth Amendment's Confrontation Clause only applies to testimonial statements and does not apply to nontestimonial statements.State v. Siler, 116 Ohio St.3d 39, 2007-Ohio-5637, ¶ 21. If a statement is testimonial, then the Confrontation Clause requires a showing of both the declarant's unavailability and the defendant's opportunity to have previously cross-examined the declarant. Id. If the statement is nontestimonial, it is merely subject to the regular admissibility requirements of the hearsay rules. See id.
¶{20} The United States Supreme Court once stated that, at a minimum, testimonial statements are those given in prior testimony (such as at a former trial, before a grand jury or at a preliminary hearing) or those made during a police interrogation. Crawford v. Washington (2004),541 U.S. 36, 68. Thereafter, the Court distinguished different statements to law enforcement officers or agents thereof based upon the purpose of the interrogation. Davis v. Washington and Hammon v. Indiana (2006),547 U.S. 813 (consolidated cases).
¶{21} Specifically, statements are nontestimonial if made during the course of a police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable the police to meet an ongoing emergency. Id. at 820. On the other hand, statements are testimonial if they are made under circumstances objectively indicating that there is no ongoing emergency as the primary purpose of the interrogation is to establish past events relevant to a later criminal case. Id.
¶{22} In applying these standards, the United States Supreme Court concluded in Davis that a 911 call was nontestimonial since any reasonable listener would recognize that the caller was facing an ongoing emergency and the answers were necessary to resolve the present emergency rather than to simply learn what happened in the past. Id. at 829. The Court recognized that a 911 call is not ordinarily designed to prove a past fact but to describe circumstances requiring police assistance. Id. The Court recognized, however, that although the initial answers elicited in a 911 call may be nontestimonial, the call can turn testimonial once the operator gleaned the information needed to address the exigency of the moment. Id. *Page 7 
 ¶{23} In the Hammon portion of the case, officers had responded to a domestic disturbance. When the officers arrived, the wife was on the front porch; she stated that everything was fine and let the officers look around the house. There, they saw broken glass from a fireplace and met the husband, who also stated that everything was fine. The officer again asked the wife for details, and when the husband kept interrupting, they separated the pair for individual questioning. At that point, the wife stated that her husband had pushed her down and hit her. When the wife did not appear for the husband's bench trial, the trial court allowed the officer to testify as to what the wife told him during the separate questioning.
¶{24} The United States Supreme Court held that there was no emergency in progress during the interrogation, which was formal in that the couple was separated. Id. at 829-830. They did note, however, that some initial inquiries at a crime scene can be nontestimonial since officers called to investigate need to know who they are dealing with in order to assess the situation, the threat to community safety and the possible danger to the victim. Id.
¶{25} Thus, the "primary purpose of the interrogation" test applies to evaluate statements made to law enforcement officers and their agents (such as 911 operators). Siler, 116 Ohio St.3d 39 at ¶ 28. But, in order to determine whether a statement to a non-law enforcement person is testimonial, the "objective witness" test of Crawford applies.Siler, 116 Ohio St.3d 39 at ¶ 26-27; State v. Stahl, 111 Ohio St.3d 186,2006-Ohio-5482, ¶ 25, 36.
¶{26} This latter test requires the court to determine whether an objective witness would reasonably believe that her statement would be available for use at a later trial. Stahl, 111 Ohio St.3d 186 at ¶ 36. The focus is on the expectation of the declarant at the time the statement is made, and the intent of the questioner is irrelevant unless it could affect a reasonable declarant's expectations. Id.
¶{27} In applying these standards, the Ohio Supreme Court has found that statements of a rape victim to a nurse were nontestimonial, even though they were made during an examination in a unit of the hospital specializing in collection of forensic evidence. Id. at ¶ 43 (holding that a witness in this situation could reasonably believe that the medical examination, including the incident history statement, serves *Page 8 
primarily as a medical function). The Stahl Court found the nurse was not acting as an agent of law enforcement and that an objective witness would not believe that her statements were available for use at a later trial. Id.
¶{28} As to appellant's first argument here, the state presented the statements of Sarah Williams to Roxanne Clark-Pless. Over objection by the defense, Roxanne testified as to what Sarah told her in a telephone call on the morning of July 13, 2007. Specifically, she testified that Sarah said appellant "beat her up real bad" and he broke her china cabinet while he was beating her. She related that Sarah said she was bleeding, could not breathe and had a black eye, a headache and scratches. (Tr. 298-299). Roxanne also stated that Sarah said she was scared and did not want appellant returning. (Tr. 299).
¶{29} Various Ohio appellate courts have found that statements such as these made to a friend are not testimonial. State v. Cook, 8th Dist. No. 87265, 2007-Ohio-625, ¶ 17 (victim's statement to daughter that defendant put his finger in her vagina is not testimonial as it was to explain why she was upset); State v. Myers, 2d Dist. No. 2006CA2,2006-Ohio-6125, ¶ 10-11 (testimony of witness that her friend had told her the defendant was driving around her house does not contain a testimonial statement).
¶{30} If the Stahl rape victim's statements to a nurse (trained in forensic recovery who was working at a special forensic hospital unit and who had her patients sign an acknowledgment that evidence would be provided to police) is not testimonial, then neither would a crying person's statements to her friend concerning the cause of her injuries. See Stahl, 111 Ohio St.3d 186. In fact, Stahl favorably cited a federal case holding that a private conversation is not made under circumstances leading an objective person to reasonably believe that the statement will be available for use at a later trial. Id. at ¶ 32, citingHorton v. Allen (C.A. 1, 2004), 370 F.3d 75, 84. See, also,Davis, 541 U.S. 813, citing Crawford, 541 U.S. 36 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.")
¶{31} Here, the person to whom the declarant was speaking was her friend of many years. The friend thought of the declarant as her second mother and called her "mom", "ma" and "mother." (Tr. 295, 303-304). Sarah told her friend what appellant *Page 9 
did to her in a private conversation while crying. These statements are not testimonial as an objective witness would not reasonably believe her statements to her friend explaining why she was upset would be available for later use at a trial. See Stahl, 111 Ohio St.3d 186 at ¶ 36. Thus, there is no Confrontation Clause issue regarding Sarah's statements to Roxanne.
¶{32} However, as aforementioned there can still be a hearsay issue even if there is no Confrontation issue. Thus, we move to appellant's contention that these statements constituted inadmissible hearsay. It is well established that the admission or exclusion of evidence rests within the sound discretion of the trial court. State v. Robb (2000),88 Ohio St.3d 59, 68. Evid. R. 803 provides that certain statements are not excluded by the hearsay rule even though the declarant is available as a witness.
¶{33} For instance, Evid. R. 803(3) allows testimony on statements concerning the declarant's "then existing" mental, emotional or physical condition. Thus, Sarah's statements to Roxanne describing her injuries and her pain were permissible. Sarah's statement that she was afraid was likewise admissible. See State v. Braden, 98 Ohio St.3d 354,2003-Ohio-1325, ¶ 100. However, this rule cannot be used for the portion of her statement as to who caused her injuries, pain and fear. SeeState v. Leonard, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 101.
¶{34} There are also the present sense impression exception of Evid. R. 803(1) and the excited utterance exception of Evid. R. 803(2). The exception for the present sense impression allows testimony on "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Evid. R. 803(1). The assault happened on the morning of July 13 and Roxanne stated that she called Sarah early on the morning of July 13. Roxanne related that Sarah was upset, crying and emotional, "things she normally isn't." Roxanne had never heard Sarah like that before. (Tr. 297).
¶{35} For the present sense impression to be applicable here, the first question is whether the trial court could have used its discretion to find that Sarah was describing the event immediately after it occurred. Appellant argues that other evidence suggested that it was not immediately thereafter and that the circumstances *Page 10 
(of Sarah recanting) indicate a lack of trustworthiness; however, such evidence was not on record at the time of the court's decision to admit the statement. Moreover, recantation that occurs weeks or months later does not make a prior statement lack trustworthiness; it is the circumstances under which the statement is made that are relevant. In any event, immediacy is not required by the next exception.
¶{36} The excited utterance exception allows testimony on "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid. R. 803(2). To be admissible under Evid. R. 803(2), a statement must concern an occurrence observed by the declarant that was startling enough to produce a nervous excitement in the declarant and must be made before there was time for such excitement to lose domination over her reflective faculties. State v. Huertas (1990),51 Ohio St.3d 22, 31 (affirming a trial court finding that a statement made 45 minutes after an event but while the declarant was still agitated and in serious pain and had not calmed down, to be an excited utterance). See, also, Cook, 8th Dist. No. 87265 at ¶ 20-21 (still under excitement even though incident occurred in early morning and daughter was told at lunch time).
¶{37} As aforementioned, Sarah was upset, emotional and crying; apparently a very unusual state of mind for Sarah. (Tr. 297). She described her injuries and her pain. Specifically, she was bleeding, she had a headache, she could not breathe, she had a black eye, and she had scratches. (Tr. 299). She was fearful as the incident had just occurred that morning and appellant was likely to return. Considering Roxanne's description of Sarah's demeanor and her testimony on Sarah's injuries, the trial court's decision to allow Roxanne's testimony on Sarah's statements to her was not unreasonable, arbitrary or unconscionable.
¶{38} We thus move to the second statement contested by appellant. Roxanne also testified as to her attempt to reach Sarah the next morning, appellant's threats to her and his refusal to put Sarah on the telephone. (Tr. 303-305). She explained that Sarah's statements to her the prior day combined with appellant's attitude and the mere fact that he was at Sarah's house motivated her to call 911 to have the police check on Sarah. Over the defense's objections, the state then played the July 14, 2007 recording of Roxanne's call to 911. (Tr. 311, 348-349). *Page 11 
 ¶{39} In the call, Roxanne sounds nervous and stressed and states that her "mom" had been assaulted and had been to the hospital the day before and that when she called her that morning, appellant was in the house and would not put her mother on the telephone. She said that appellant is not supposed to be there, at which point the dispatcher asked her to slow down. When asked for her name, she advised that she wanted to remain anonymous, noting that appellant had threatened her too. When asked if he had any weapons, Roxanne said the she did not know but that appellant was big enough to be his own weapon.
¶{40} Appellant now contends that the tape was played in violation of the Confrontation Clause because it is testimonial. However, a 911 call is not typically testimonial, especially during the initial questioning.Davis, 547 U.S. 813. Here, the circumstances objectively indicate that the primary purpose of the dispatcher's questions was to ascertain the emergency and to determine how to resolve it. See id. Without the facts related by Roxanne, the dispatcher would not have been presented with sufficient information to dispatch police to Sarah's house. The call was made and the questioning of Roxanne occurred under the assumption that an emergency was ongoing and that Sarah was in imminent danger. Moreover, the statements within the 911 call regarding what Sarah told Roxanne were already addressed under appellant's first argument supra. Finally, Roxanne was testifying as her own 911 call was played. Thus, appellant was not deprived of his rights to confront her.
¶{41} Besides his Confrontation Clause argument, appellant alternatively argues that Roxanne's 911 call constituted inadmissible hearsay within hearsay. Regarding the second tier of claimed hearsay, we already determined that Sarah's statements to Roxanne were the type of statements that a trial court could rationally find to be excited utterances. As to Roxanne's statements about her own observations (the first tier of the hearsay within hearsay argument), a rational trier of fact could find that her statements were excited utterances as well. Roxanne was acting under the information that Sarah had been badly beaten by appellant the day before, that Sarah had reported the beating to the police and that Sarah had been treated at the hospital. She knew Sarah was scared and did not want appellant returning to her house. Sarah had debated coming to stay at Roxanne's but was embarrassed by her appearance. *Page 12 
 ¶{42} Then, when Roxanne called to check on Sarah the next morning, appellant was at Sarah's house and answering her phone. He "hollered" at her and threatened her, saying, "bitch, I know where you live." (Tr. 303, 305). Roxanne stated that she panicked and "thought worse" things had happened as she could not hear Sarah in the background and appellant would not put Sarah on the telephone. Appellant hung up on her twice, at which point she immediately called 911. These facts all establish a foundation for her statements within the 911 call to come in under the excited utterance exception. In fact, her nervous excitement is apparent in the taped call.
¶{43} Contrary to appellant's suggestion, Roxanne did observe a startling event; she called to check on her beaten friend and found the assailant answering the phone, threatening her and refusing to let the caller speak to the owner of the phone. As outlined above, the fact that a person does not put another on the telephone may not by itself warrant the dispatch of officers unless the background is told to 911. When that background information was gleaned through a manner that allowed it to come in under a hearsay exception itself, the entire call can be admitted.
¶{44} As such, the court did not abuse its discretion in finding that Evid. R. 803(2) applied to the first tier as well as the second tier of the claimed hearsay within hearsay. Furthermore, because Roxanne already testified consistent with the contents of the 911 tape, prejudice is not apparent as to the playing of the tape. See Evid. R. 801(C) (hearsay is a statement by a declarant, other than one made in court while declarant is testifying at the trial, to show proof of the matter asserted).
¶{45} We now reach the third statement contested by appellant here. Officer Walker testified as to what Sarah told him when he arrived at her residence on July 13, 2007, upon being dispatched in regards to a fight. He stated that Sarah looked as though she had been in a fight and had been crying. She seemed afraid, and he could see that she had a "busted lip" and a swollen face. (Tr. 327-328). Roxanne had already testified that Sarah was waiting for the police when she spoke to her the first time on July 13 (and we already characterized Sarah's statements to Roxanne as excited utterances). (Tr. 299). *Page 13 
 ¶{46} Over objection, the officer testified that Sarah said that appellant came in that morning and hit her in the face a couple of times with his fist. (Tr. 328-329). He also said that Sarah was afraid of appellant and thought he would beat her up again if he knew the police had been there. (Tr. 329).
¶{47} Considering Sarah's demeanor to Roxanne, our prior finding that her statements to Roxanne could reasonably constitute excited utterances and the fact that Sarah was waiting for the police at the time, it was not unreasonable, arbitrary or unconscionable for the court to find that Sarah's initial statements to Officer Walker also constituted excited utterances. She appeared to have still been under the stress of the startling event of being beaten by her boyfriend. This is especially true when adding the physical ailments and pain the beating caused, Officer's Walker further description of her demeanor and her fear that appellant would return and beat her again. See, e.g., Cook, 8th Dist. No. 87265 at ¶ 22 (victim remains at scene and fears defendant may return).
¶{48} Yet, the fact that a statement is not inadmissible hearsay does not preclude a finding that the admission of the statement violates the Confrontation Clause. We note that Sarah testified against appellant at the preliminary hearing. Thus, he had a prior opportunity to cross-examine her. Still, it is generally stated that in order to allow the statement, the declarant must also be unavailable.Crawford, 541 U.S. 36, 68 (Sixth Amendment requires unavailability and prior opportunity to cross-examine). Although Sarah was changing her testimony and refusing to testify in accordance with her prior statements, she was available and did in fact testify for the defense.
¶{49} Appellant relies on the Hammon holding in support of his claim that the Confrontation Clause was violated here. Appellant also claims that there was no emergency because the fight occurred earlier and at the McGuffey Plaza. However, this was not part of the evidence at the time Officer Walker testified. Sarah's later claim of a fight with Tracey Jordan presented an issue of credibility, not an issue that could cause a situation to lose its emergency nature. Notably, theDavis/Hammon test deals with the purpose of the officer's interrogation, not the intent of the declarant. Davis, 547 U.S. at 820. *Page 14 
 ¶{50} The Hammon case can also be distinguished as that Court relied upon the fact that when the officers arrived to investigate a disturbance, the wife twice stated that everything was fine. She did not incriminate the husband until further conversation had occurred after the police had separated the couple in order to more thoroughly question them further.
¶{51} Here, there is no indication that Sarah gave the impression that everything was fine. From what the trial court was presented with at the time of the introduction of the evidence, the officer was responding to a 911 call by a whispering victim who stated that she had been beaten. There is no indication in the record that, when he first obtained the brief statements against appellant, the primary purpose of his investigation was to collect evidence against appellant as opposed to resolving an emergency.
¶{52} Although the primary purpose of the investigation shifted from fact-finding to collecting evidence, the initial statements to the responding police officer do not fit the Hammon model. They appear to have been spontaneously made upon the officer's approach where the victim was concerned about appellant's return (and, in fact, he did return later that night). As the Hammon Court concluded:
¶{53} "`[o]fficers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.' [Hiibel v.Sixth Judicial Dist. Court, 542 U.S. 177, 186 (2004)]. Such exigencies may often mean that `initial inquiries' produce nontestimonial statements." Hammon, 547 U.S. 813.
¶{54} Even if we assume arguendo that Hammon extends to Sarah's initial statements made to Officer Walker, we find a lack of prejudice as there was other evidence that established the same information testified to by the officer. In fact, Roxanne's testimony was much more detailed than that of the officer, who merely presented a brief and basic reiteration of Sarah's claims, which had already been introduced by Roxanne. Moreover, the emergency room physician, whose testimony is not at issue here, observed multiple injuries including a broken nose. He testified that Sarah told him her injuries were caused by her boyfriend beating her that morning. *Page 15 
Although she did not state her boyfriend's name to the physician, other testimony established that appellant was her boyfriend.
¶{55} Additionally, evidence not now at issue established appellant's guilty conscious in that he would not let Sarah open the door the next day upon the officers' arrival. In fact, excited utterances of Sarah on July 14 establish that she was afraid of appellant and that he threatened her with death if she opened the door. (Tr. 367). The jury also heard that on July 14, appellant told Sarah to tell police that her face was swollen because a bee stung her. (Tr. 368).
¶{56} Finally, Sarah's testimony presented by the defense admits that she gave a statement that appellant beat her and which thus confirms Roxanne's and the officer's testimony. Thus, any Confrontation Clause problem regarding Officer Walker's testimony is harmless beyond a reasonable doubt. For all of the foregoing reasons, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWO ¶{57} Appellant's second assignment of error provides:
¶{58} "THE STATE VIOLATED THE BATSON V. KENTUCKY STANDARD WHEN IT IMPROPERLY USED A PEREMPTORY CHALLENGE TO EXCLUDE THE ONLY FEMALE BLACK JUROR IN THE JURY POOL IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT."
¶{59} A claim of racially discriminatory use of a peremptory challenge is subject to the three steps set forth in Batson v. Kentucky (1986),476 U.S. 79. First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination, which can be accomplished by merely showing that the juror is African-American. Id. at 96-98. Then, the proponent of the challenge must provide a racially neutral explanation for the challenge. Id. If the proponent provides such explanation, the trial court must view all the circumstances and determine whether the explanation is merely pretextual and thus whether there was purposeful discrimination. Id. at 98.
¶{60} One factor in determining purposeful discrimination entails an evaluation of whether the state's reason for striking a black panelist applies just as well to a non-black panelist. Miller-El v. Dretke
(2005), 545 U.S. 231, 241. Still, because the decision is largely based upon credibility, we defer to the trial court and do not reverse *Page 16 
absent a clearly erroneous decision. See State v. Frazier,115 Ohio St.3d 139, 2007-Ohio-5048, ¶ 64; State v. Bryan, 101 Ohio St.3d 272,2004-Ohio-971, ¶ 110.
¶{61} Within the initial jury pool, there were two potential black jurors, number seven and number twenty-five. (Tr. 167). Number seven was a black female reverend. After approximately one hundred fifty pages of voir dire regarding the original panel of twelve, the state exercised a peremptory challenge on juror number seven. (Tr. 165). The defense lodged a Batson objection. (Tr. 167).
¶{62} The state listed the following reasons: when the juror was asked a direct question, she would ask the prosecutor to repeat it; she did not seem receptive and did not seem to be paying attention; she made comments about innocent people who had been convicted; she made references to beyond a reasonable doubt and termed them personal observations; and, she twice stated that she did not know if she could disregard sustained objections. (Tr. 168, 170).
¶{63} The defense responded that the acoustics in the courtroom were poor, noting that other jurors asked for questions to be repeated and that the attorneys asked jurors to repeat responses. The defense also contended merely because the juror had heard about people being wrongfully convicted did not justify her excusal. (Tr. 169).
¶{64} Although the court acknowledged that both attorneys had soft voices, the court pointed out that numerous times it appeared as though juror number seven was not paying attention or was having an attention problem. (Tr. 169-170). The court noted that juror number seven "seemed more so to lean toward her own personal beliefs than she did in almost anything that either one of you were saying to me." (Tr. 170). The court concluded that there was no discrimination in the state's excusing juror number seven. (Tr. 169).
¶{65} Here, the issue is with step three in the Batson analysis. We must thus review the trial court's decision that the state's racially neutral reasons were not pretextual.
¶{66} Appellant contends that the answers of juror number seven were similar to those of juror number one. However, the answers and the context of the questioning were not particularly similar. When asked whether he wanted to serve, *Page 17 
juror number one stated that he did not want to when he filled out his questionnaire because he was not confident that he could judge someone's fate but changed his mind after hearing the seriousness of the questions in voir dire. (Tr. 58). When asked if he could pronounce whether the defendant is guilty or not guilty, he said that he could. (Tr. 59). He said he could "definitely" vote guilty if the state proved its case beyond a reasonable doubt. (Tr. 75).
¶{67} Juror number seven on the other hand responded to the latter question by stating, "Yes, I think. I may have some reservations." (Tr. 73). When asked to explain, she confusingly stated, "Because I know there's an element that could be — would be questionable." When the state expressed that it did not understand her answer, the juror asked the state to repeat the question. When the state again asked whether she could find the defendant guilty if the state proved the case beyond a reasonable doubt, juror number seven responded, "I think so." In explaining her reservations, she stated, "Because I know people that they said was reasonable doubt and they were innocent." However, she then said that she did not know personally of such a case. (Tr. 74). Finally, she opined that she could follow the law. (Tr. 75). Thereafter, she interjected that based upon her life experiences she knows that beyond a reasonable doubt does not mean beyond all doubt. (Tr. 77-78).
¶{68} The state later asked the jurors why a victim may not want to go forward against a defendant. Other jurors gave responses, but when the state asked juror number seven for a reason, she asked to have the question repeated as if she had not been following the conversation. (Tr. 84-85). She also did not provide the clearest of answers on other questions. (Tr. 90, 121-123, 163-164).
¶{69} Finally, the defense asked juror number seven if she would have a problem if the judge sustained an objection and instructed her to disregard the question or the answer. She responded, "When people say disregard I watch on TV, I want to say — why, why did they disregard cause it's been said." When the defense pressed whether she could do it if the judge instructs as such, she responded, "Probably. I'm not saying I can." (Tr. 147). The defense pressed further on whether she could follow the judge's instructions, and she again responded, "I really don't know." (Tr. 148). *Page 18 
 ¶{70} As such, the totality of her answers is much different than the answers provided by juror number one. She never really concluded with a statement that she could follow the judge's instructions. Her answers showed doubt about the accuracy of the criminal justice system. Although this is common, the state can reasonably be concerned about her attitude as reflected in her answers. There also is no evidence of disparate questioning. See Frazier, 115 Ohio St.3d 139 at ¶ 70.
¶{71} Whether juror number seven asked for questions to be repeated due to acoustics and voice levels or whether she asked for questions to be repeated because she was not paying attention is a question best left to the trial court who watched her demeanor as the state directed questions to her. The transcript supports that there were various reasons, unrelated to her race, for concern with juror number seven from a prosecutorial standpoint. Thus, we defer to the trial court's credibility determination when it found that the state's reasons were not pretext for purposeful racial discrimination. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER THREE ¶{72} Appellant's third assignment of error contends:
¶{73} "THE STATE COMMITTED PROSECUTORIAL MISCONDUCT WHEN THE STATE BOTH VOUCHED FOR ITS CASE BY CLAIMING MS. WILLIAMS' TESTIMONY WAS UNRELIABLE AND ELIMINATED ITS BURDEN OF PROOF DURING CLOSING ARGUMENT BY SHIFTING IT TO THE DEFENSE IN VIOLATION OF APPELLANT PEEPLES' FOURTEENTH AMENDMENT DUE PROCESS RIGHTS."
¶{74} In evaluating a claim of prosecutorial misconduct in closing arguments, we first determine whether the remarks were improper.State v. Smith (1984), 14 Ohio St.3d 13, 14. If the remarks were improper, we then determine whether the remarks prejudicially affected the defendant's substantial rights. Id.
¶{75} In determining whether the remarks are improper, we begin with the principle that the prosecution is entitled to significant latitude in its closing remarks. Furthermore, the prosecutor may comment on what the evidence has shown and the reasonable inferences that may be drawn from the evidence. State v. Lott (1990), 51 Ohio St.3d 160, 165. *Page 19 
 ¶{76} First, appellant takes issue with the following statement of the prosecutor: "I have an obligation not to put on false testimony, so I didn't put on Sarah Williams." (Tr. 650). Appellant's objection to this statement was overruled. (Tr. 651). Appellant complains that this statement improperly expressed a personal opinion on the credibility of a witness.
¶{77} It is not proper for an attorney to express a personal belief or opinion as to the credibility of a witness. State v. Jackson,107 Ohio St. 53, 2005-Ohio-5981, ¶ 17, citing State v. Williams (1986),79 Ohio St.3d 12, 16. Improper vouching does not occur unless the prosecutor implies knowledge of facts outside the record or places the prosecutor's personal credibility in issue. Id., citing State v. Keene (1998),81 Ohio St.3d 646, 666.
¶{78} The prosecutor may comment upon the testimony of a defense witness and suggest the conclusions to be drawn therefrom. State v.Hand, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 116. Thus, the prosecutor may state that the evidence supports a conclusion that the defense witness is not telling the truth. Id.
¶{79} Here, the prosecutor stated the evidence supported the conclusion that the witness was lying. The state had outlined all the evidence that showed why Sarah's testimony was not credible. The prosecutor then went a bit further with its statement that it did not put on Sarah's testimony because of his obligation not to put on false testimony. This rationale for not presenting testimony in order to avoid violating an ethical obligation seems to cross the line into a personal opinion. That is, the prosecutor is essentially saying that he personally believes her testimony is false.
¶{80} Still, the statement was made in the rebuttal portion of the state's closing argument. The state suggests that it was responding to comments of the defense in its closing which implied that the state wanted to suppress Sarah's testimony. (Tr. 629-630, 635-636). For instance, the defense stated that Sarah told the prosecutor a couple weeks prior that she had changed her story and made veiled references to what the state knew when it presented its case. Id. The defense said this contemporaneously with its allegations that the state failed to meet its burden of proof. Still, the defense did not directly accuse the state of suppressing evidence, and any implication is not that clear. *Page 20 
 ¶{81} In any event, we conclude that the statement did not prejudice appellant's substantial rights. The court twice instructed the jury that the arguments of counsel were not evidence. (Tr. 277, 654-655). The court also informed the jury that they were the sole judges of the facts and of witnesses' credibility. (Tr. 656).
¶{82} Furthermore, the jury was clearly aware that the main issue was whether Sarah was telling the truth on July 13 and 14 or whether she was telling the truth during her testimony. The prosecutor's statement in rebuttal would not have tainted the jury's evaluation of Sarah's claims. All the witnesses found Sarah to be frightened on July 13 and 14, which would coincide with being abused by her boyfriend but not with being beat up by a girl in a parking lot after finding her kissing appellant.
¶{83} Sarah herself provided many reasons for the jury to disbelieve her testimony. She began by telling a story of Tracey beating her at McGuffey Plaza that was disjointed and without detail. Her description of Tracey apparently did not match Tracey's appearance on the stand (including incorrect height, skin shade and hair color). Defense counsel asked her if the story she told police was truthful, and Sarah answered "yes" two times. (Tr. 524). Upon defense counsel's further inquiry, she responded that appellant did not punch her and explained that she was confused. (Tr. 525). Although Sarah testified that appellant had his own drawers in her house at the time and that they were about to make love when the police began knocking on July 14, an officer testified that appellant had bags packed and Sarah asked the officer to take the bags away. (Tr. 370, 543).
¶{84} We also note that one of the main defenses presented in appellant's closing was that Roxanne was lying. Although Sarah initially denied calling Roxanne with the story of her beating, the defense must not have noticed that Sarah then admitted on cross-examination thatshe did in fact tell Roxanne that appellant beat her. (Tr. 574). As such, reversible prejudice in the prosecutor's comment about false testimony is not apparent.
¶{85} Appellant also takes issue here with the following prosecutorial comment:
¶{86} "And, also, defense counsel is talking about phone records and how Sarah Williams said she didn't call Roxanne. Well, if you recall when I asked her, she *Page 21 
said she did speak to Roxanne. But if defense counsel had wanted phone records, [objection overruled] She has the right to get those phone records. She could have bought them in court to you." (Tr. 640-641).
¶{87} Appellant believes that this improperly shifted the burden of proof to the defense. However, this comment was made in rebuttal in direct response to defense counsel's similar comments. For instance, defense counsel suggested that the state did not properly investigate the case. (Tr. 630-632). Counsel then argued that Sarah denied making a call to Roxanne and declared: "Maybe some phone records could have been obtained to clarify whether that occurred or not." (Tr. 632-633). Thus, the defense clearly opened the door to the state's comment.
¶{88} Regardless, the prosecutor may comment upon the failure of the defense to offer evidence in support of its case. State v. Clemons
(1998), 82 Ohio St.3d 438, 452; State v. Bies (1996), 74 Ohio St.3d 320,326. Such comments do not imply that the burden of proof has shifted to the defense. State v. McKnight, 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 293
(where prosecutor asked, "Why didn't [the defense] present any witnesses?"), citing State v. Collins (2000), 89 Ohio St.3d 524,527-528. As such, this argument is without merit.
 ASSIGNMENT OF ERROR NUMBER FOUR ¶{89} Appellant's fourth assignment of error provides:
¶{90} "THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT PEEPLES' SIXTH AMENDMENT RIGHT TO CONFRONT A STATE'S WITNESS FOR IMPEACHMENT PURPOSES."
¶{91} As set forth in the statement of facts, the state called Tracey Jordan to rebut Sarah Williams's claims that she was beaten by Tracey after Sarah caught her kissing appellant in the parking lot at McGuffey Plaza. Tracey testified that she briefly dated appellant three or four years ago and that she has not seen him in years. (Tr. 593). She denied that she had been in a fight with Sarah Williams on July 13, 2007. She also stated that until that morning at trial when the prosecutor pointed Sarah out to her, she had never seen Sarah Williams, noting that Sarah walked right past her in court as if she did not know who she was. (Tr. 594).
¶{92} On cross-examination, the defense asked the following: *Page 22 
 ¶{93} "Q. You currently operate a day care center?
¶{94} "A. Yes. I work with children.
¶{95} "Q. And there's some pretty strict licensing requirements with the day care center?
¶{96} "A. Yes.
¶{97} "Q. Any allegations of criminal wrongdoing?"
¶{98} At that point, the state objected, and the court sustained the objection. (Tr. 595). In its proffer, the defense explained:
¶{99} "I was going to ask her she's licensed to have her day care center, if she receives any criminal charges or allegations of criminal charges, she's subject to losing that license, I had wanted to inquire as a motive for her to deny that this had occur[ed] and a motive for giving her improper or false testimony." (Tr. 603).
¶{100} Appellant now claims that the court's ruling improperly violated his Confrontation Clause right to impeach Tracey Jordan by cross-examination that would have established that she had a motive to deny beating Sarah Williams.
¶{101} Pursuant to Evid. R. 611(B), cross-examination shall be permitted on all relevant matters and matters affecting credibility. Bias, prejudice, interest or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence. Evid. R. 616(A). The Confrontation Clause in part protects the defendant's right to cross-examine witnesses presented against him.Delaware v. Fensterer (1985), 474 U.S. 15, 18.
¶{102} Appellant's proffer states that he wished to ask if criminal charges would cause her to lose her license. However, the question to which the objection was entered asked the witness if she has ever had any allegations of criminal wrongdoing made against her. It is convictions of certain crimes, not allegations of crimes that are permissible for impeachment. Evid. R. 609.
¶{103} Even if the court did preclude the questions suggested in the proffer, appellant's citation does not support his position. That is, he cites R.C. 5104.09(A)(1)(a), which provides that no person who has been convicted of R.C. 2903.11 (felonious assault) shall be employed in any capacity in or own or operate a child day care center, type A family day care home, type B family day care home, or *Page 23 
certified type B family day care home. However, for purposes of that statute, the various types of day-care centers are specifically defined by the number and ages of children and whether the home is located in the administrator's home. R.C. 5104.01(L), (RR), (SS).
¶{104} Here, the defense did not lay a foundation that Tracey's center fits under this statute. Merely because she responded affirmatively when asked if she operated a day care does not mean that it fit the definition of this section. In fact, she twice described her employment by merely saying, "I work with children." Even defense counsel's question about licensing does not mean that she is actually subject to licensing but could reflect her knowledge that day cares can be subject to licensing. Furthermore, the statute refers to conviction not "allegations of criminal wrongdoing."
¶{105} In any event, her motive to lie was set out for the jury in that if Sarah's current testimony was believed, then it would be Tracey under indictment rather than appellant. All the possible results or effects of a potential conviction need not be delved into, especially where charges are not even pending. See United States v. Nelson (C.A.7, 1994), 39 F.3d 705, 708, quoting United States v. Saunders (C.A.7, 1992), 973 F.2d 1354, 1358 (Confrontation Clause protects right to expose motive of witness to lie but does not provide an unlimited right to add extra details to the motive). The witness's motive to lie is the potential to be charged and convicted if appellant is acquitted and if Sarah's story is believed. The right to prove motive does not necessarily encompass every consequence of a conviction (such as: fear of prison; claustrophobia; desire to avoid paying a fine, restitution or a judgment in a civil suit; fear of losing one's job or job prospects; embarrassment), and it does not appear that the court is required to allow inquiry into every possible consequence. At the very least, the inability to delve into one's myriad reasons for desiring not to be charged and/or convicted is not prejudicial here. As such, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER FIVE ¶{106} Appellant's fifth assignment of error alleges:
¶{107} "THE STATE PRODUCED INSUFFICIENT ADMISSIBLE EVIDENCE TO PROVE SERIOUS PHYSICAL HARM, DENYING THE APPELLANT PEEPLES' *Page 24 
FOURTEENTH AMENDMENT RIGHT TO HAVE EVERY FACT NECESSARY TO SUSTAIN A CONVICTION PROVEN BEYOND A REASONABLE DOUBT."
¶{108} Sufficiency of the evidence deals with legal adequacy rather than the weight or persuasiveness of the evidence. State v.Thompkins (1997), 78 Ohio St.3d 380, 386. In viewing a sufficiency of the evidence argument, we evaluate the evidence in the light most favorable to the prosecution. State v. Goff (1998), 82 Ohio St.3d 123,138. A conviction cannot be reversed on grounds of sufficiency unless the reviewing court determines that no rational juror could have found that the elements of the offense were proven beyond a reasonable doubt. Id.
¶{109} Felonious assault is committed when a person knowingly causes serious physical harm to another. R.C. 2903.11(A)(1). The only element contested here is that of serious physical harm. Serious physical harm is defined as follows:
¶{110} "(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
¶{111} "(b) Any physical harm that carries a substantial risk of death;
¶{112} "(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
¶{113} "(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
¶{114} "(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5).
¶{115} The degree of harm that rises to the definition section's level of "serious" is not a precise science, especially since the statute utilizes descriptors such as "substantial," "temporary," "acute," and "prolonged." State v. Irwin, 7th Dist. No. 06MA20, 2007-Ohio-4996, ¶ 37. Moreover, whether physical injuries arise to the level of serious physical harm is typically a question of the weight rather than the sufficiency of the evidence. Id., citing State v. Salemi, 8th Dist. No. 81091, 2002-Ohio-7064, ¶ 34.
¶{116} Appellant argues here that the police reports only listed minor injuries. He also points out that the victim did not require hospitalization and that the mere seeking of medical help did not make physical harm serious. He points out that on the *Page 25 
admittance form, the victim only rated her pain as a one on a scale of one to ten. He also cites Sarah's testimony presented during his defense that she did not take pain medication.
¶{117} As the state points out, circumstantial evidence inherently possesses the same probative value as direct evidence. State v.Treesh (2001), 90 Ohio St.3d 460, 485. In any event, there was direct evidence concerning Sarah's injuries and their effects. Specifically, the state's position at trial focused on the last two options in R.C. 2901.01(A)(5). (Tr. 616-621).
¶{118} Under R.C. 2901.01(A)(5)(d), a rational juror, viewing the evidence in the light most favorable to the prosecution, could find that Sarah suffered physical harm that involves some temporary, serious disfigurement. For instance, she suffered a black eye that was still clearly visible eleven days after the incident (even though the victim had attempted to cover it with make up). (Tr. 299, 302-303). The jury had the opportunity to view photographs depicting this black eye.
¶{119} In addition, her nose had been broken which caused swelling. This swelling was evident to Officer Walker when he responded to Sarah's 911 call. (Tr. 327-328). The day after the incident, Officer Wilson also noticed that the victim's face was swollen. (Tr. 368). Her face was so swollen on this day, that appellant told her to tell the officers that she had been stung by a bee. (Tr. 368). According to the physician, the swelling of her face extended to her nose, her forehead and her left cheek. (Tr. 453).
¶{120} Her left shoulder was also swollen, which along with the pain, resulted in the ordering of x-rays of the area. (Tr. 433, 444). Moreover, she had a "busted" lip. (Tr. 327). She had abrasions on her body and bruises to her face and head. (Tr. 426, 449). The bruise to her mid-back combined with the pain it caused resulted in the ordering of an x-ray of that area. (Tr. 427, 433-434). Finally, she expressed that she did not want to stay at Roxanne's house because she was embarrassed by the way she looked. (Tr. 299-300). Combined, this is all sufficient evidence of a temporary, substantial disfigurement.
¶{121} Alternatively, after viewing the evidence in the light most favorable to the state, a reasonable fact-finder could also determine that the state sufficiently *Page 26 
proved serious physical harm under R.C. 2901.05(A)(5)(e): physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.
¶{122} For instance, Sarah told Roxanne that appellant beat her "real bad". (Tr. 298). At the time of that phone call, Sarah was bleeding, she could not breathe and she had a headache. (Tr. 299). She was crying. (Tr. 297). She called an ambulance to take her to the hospital where she remained for several hours.
¶{123} Although Sarah only rated her pain as a one on a scale of one to ten in the admittance papers, it was suggested that she may not have realized that one was the lowest rating. In addition, the physician testified that based upon her statements and her appearance, Sarah's pain seemed to rate more than a one. (Tr. 463-464). As aforementioned, she had muscle and skeletal pain in her shoulder which resulted in the ordering of an x-ray. She had pain in her mid-spine, which also resulted in an x-ray. She described the pain in these areas, her upper chest and her nose as throbbing. (Tr. 433).
¶{124} The physician testified that a closed nasal fracture such as Sarah's often hurts worse than an open fracture due to the build up of pressure. (Tr. 429-430). He described her nondisplaced fracture as a flattening or imploding of the bone. (Tr. 428). She was given a steroid injection to help with swelling and congestion. She was also given a non-steroidal agent to help with swelling. She was provided with Valium in the emergency room. She was then given Darvocet for pain relief. She was also prescribed Darvocet upon her discharge. (Tr. 432).
¶{125} Her testimony, presented in the defense's case, that she did not recall taking pain medication upon her release, does not make it so and does not affect the sufficiency of the state's evidence. (Tr. 529-530). In fact, her testimony on pain was highly contradictory from question to question, and she essentially admitted that the pain forced her to go to the hospital. (Tr. 529, 551, 553-554, 561).
¶{126} Finally, there were scratches and bruises elsewhere on her body. Her face and the left temporal area of her head were tender. Her lip had been split open. Even if these latter injuries would not satisfy the pain threshold by themselves, they *Page 27 
can be added to the more pain-generating events in support of proving the total pain suffered.
¶{127} Viewed in the light most favorable to the state, all of the evidence on Sarah's injuries and the effect of such injuries, combined with her statements to the physician and to Roxanne about her pain, could lead a rational juror to conclude that she suffered acute pain of such duration as to result in substantial suffering. In the alternative, these injuries could also be said to have caused prolonged pain as the broken nose does not just heal itself in a day, nor would the bruised and swollen back and shoulder. For all of these reasons, this assignment of error is overruled.
¶{128} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Donofrio, J., concurs.
Waite, J., concurs. *Page 1