[Cite as *State v. McCollum*, 2023-Ohio-69.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                    :

    Plaintiff-Appellee,              :

                                     No. 111370

    v.                                               :

CARLOS J. MCCOLLUM,                              :

    Defendant-Appellant.            :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 12, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-661744-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Kevin R. Filiatraut, Assistant Prosecuting
Attorney, *for appellee*.

Edward M. Heindel, *for appellant*.

LISA B. FORBES, J.:

{¶ 1} Carlos J. McCollum ("McCollum") appeals his convictions for aggravated murder and other associated offenses. After reviewing the facts of the case and pertinent law, we affirm the trial court's decision.

## I.  Facts and Procedural History

{¶ 2}  This case involves the July 17, 2021 murder of Kenneth Marks ("Marks").  The facts of this case are undisputed.  McCollum killed Marks by shooting him in the left shoulder and chest area and beating his face and head with a claw hammer.

{¶ 3}  On July 26, 2021, McCollum was charged with a ten-count indictment including one count of aggravated murder, two counts of murder, two counts of felonious assault, one count of having weapons while under disability, two counts of aggravated robbery, and two counts of robbery, along with firearm, repeat violent offender, and notice of prior conviction specifications.  The case proceeded to trial, and on March 11, 2022, McCollum was found guilty as indicted.  On March 15, 2022, the court sentenced McCollum to life in prison with the possibility of parole after 47-49.5 years.

## II.  Assignments of Error

{¶ 4}  On appeal, McCollum raises six assignments of error for our review.

1. The trial court erred when it denied McCollum's motion for a mistrial after McCollum's outburst.

2. The trial court erred when it failed to instruct the jury to disregard McCollum's outburst.

3. The trial court erred when it required the parties to exercise their peremptory challenges without the prospective jurors being present in the jury box.

4. The convictions were not supported by sufficient evidence.

5. The convictions were against the manifest weight of the evidence.

6. The Reagan Tokes act is unconstitutional because it violates the Due Process Clauses of the United States and Ohio constitutions, the separation of powers doctrine embodied in the Ohio Constitution, and the right to a jury trial as guaranteed by the United States and Ohio Constitution.

## III. Law and Analysis

### A. McCollum's Outburst

{¶ 5} During the prosecutor's opening statement at trial, he said the following to the jury: "[Y]ou'll hear Ernest Hill and Jesse [sic] Jones testify [that McCollum] told [them], give me your phones, don't call 911, don't do that, and said to them, pointing at * * * Marks, I heard he, referring to * * * Marks, was telling people he raped me."

{¶ 6} McCollum interrupted the prosecutor and stated the following in open court:

> M****r f*****g truth. As God [i]s my witness. Kill me now. That man sodomized me. You think I woke up and killed him for nothing? You think I killed him for nothing? Not my life, my career, my kids, my house, my home, my job. You think I did that for nothing? That's my little cousin. I know that boy for 36 years.
>
> * * *
>
> I just woke up and killed him for nothing? Huh? For nothing? I did that, right? Huh?
>
> And you know me, Mr. Morris. You know me. You know me. You know them. You arrested them many of times.

{¶ 7} After this outburst, the judge had McCollum temporarily removed from the courtroom to calm down. When the proceedings reconvened, defense counsel moved for a mistrial, stating the following on the record in the jury's

presence: "Unfortunately during the outburst in the presence of the jury my client made some admissions, a lot of admissions, that cannot by unheard by the jury. And his demeanor exhibited a lot of anger and things that all will prejudice him in any proceedings going forward with this jury. Therefore, we ask the court to declare a mistrial."

{¶ 8} The court denied McCollum's request and noted that "these were opening statements. And the court will instruct the jury and we'll proceed." The court then instructed the jury as follows:

> Ladies and gentlemen of the jury, we are going to continue with opening statements * * *. Please remember, as I stated to you before, that you are to listen to the evidence from the witness stand, not from the parties, not from opening statements made by counsel. Your attention is to be drawn to the evidence that will be presented in this court through witnesses, direct evidence and stipulations as has been explained to you already. So please be mindful of that in your deliberations. And the information that you are to take in to consider comes from those sources.

{¶ 9} The next morning, prior to the continuation of witness testimony, the following colloquy took place between a juror and the court:

> JUROR: Judge * * *, I do have a question. I have a question about testimony. I need some clarification. I think I know the answer, but I'm not sure.
>
> So what I was wondering is, if the defendant's remarks made yesterday were considered to be testimony?
>
> THE COURT: I appreciate your question. As I instructed everyone yesterday, the testimony is to come from the witness stand, okay, and the exhibits and any stipulations that are received. That is the evidence that you would use for your deliberations.

{¶ 10} Based on this juror's question, McCollum renewed his motion for a mistrial. The court again denied his motion, finding that it "has no concerns that this jury isn't doing exactly what they're supposed to be doing and that is to be listening to the evidence that comes from the witness stand."

### 1. Motion for a Mistrial

{¶ 11} In his first assignment of error, McCollum argues that the trial court should have granted his motion for a mistrial after his outburst before the jury. "The grant[ing] or denial of an order of mistrial lies within the sound discretion of the trial court. * * * Moreover, mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995).

{¶ 12} A "trial court must determine, as a question of fact, whether an emotional outburst in a murder trial deprived the defendant of a fair trial by improperly influencing the jury." *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 44. However, this court has held that when the defendant is the culprit of the emotional outburst, the issue "falls under the invited error doctrine." *State v. Williams*, 8th Dist. Cuyahoga No. 106266, 2018-Ohio-3368, ¶ 40. In *Hal Artz Lincoln-Mercury v. Ford Motor Co.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus, the Ohio Supreme Court held that a "party will not be permitted to take advantage of an error which he himself invited or induced."

{¶ 13} In *Williams*, this court found that the trial court acted within its discretion when it denied the defendant's motion for a mistrial after he said the following to a witness who was about to testify against him:

> Man, * * * what you doin'? You just wrote me and told me you weren't coming. * * * Ma'am, your Honor, I know this woman. We've been having sex since I was 15 years old. She's been —. Her address [is] * * * Road. She been telling me she wasn't coming. This is bull [* * * ]. She been writing letters. Her address * * *. I know this woman. * * * You just told me you weren't coming. Man, I don't believe you just show up when you just told me you weren't coming.

*Williams* at ¶ 36.

{¶ 14} After this outburst, the trial court had Williams removed from the courtroom for the duration of the trial. Furthermore, it instructed the jury as follows: "You are to completely disregard anything and everything you heard from the mouth of the defendant, Mr. Williams. He was not under oath, his statements are not testimony, they are not evidence, you must not and shall not consider them for any purpose whatsoever." *Id*. at ¶ 39. Specifically, the *Williams* Court held that "[t]he trial court appropriately cautioned the jury to disregard Williams's outburst and used its discretion to determine that Williams could still receive a fair trial. There is no evidence that the outburst materially affected the merits of the case or otherwise prejudiced Williams * * *." *Id*. at ¶ 41.

{¶ 15} In following *Williams*, we find that the trial court in the case at hand acted within its discretion when it denied McCollum's motion for a mistrial. McCollum had an emotional outburst in front of the jury and then argued that he should get a new trial because his own words and actions prejudiced him. Under

Ohio law, McCollum is not permitted to take advantage of this situation. Accordingly, his first assignment of error is overruled.

### 2. Jury Instructions

{¶ 16} In his second assignment of error, McCollum argues that the curative jury instruction given by the trial court after his outburst "failed to instruct the jury to disregard [this] outburst." The appellate standard of review concerning a trial court's jury instructions is "abuse of discretion under the facts and circumstances of the case." *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989).

{¶ 17} First, we note that a "jury is presumed to follow the instructions, including curative instructions, given it by a trial judge." *Garner* 74 Ohio St.3d at 59, 656 N.E.2d 623. Second, upon review, we find that the court did instruct the jury, albeit indirectly, to disregard McCollum's outburst. Specifically, the court instructed the jury, in part, as follows: "[Y]ou are to listen to the evidence from the witness stand, not from the parties, not from opening statements made by counsel." McCollum's outburst did not occur from the witness stand. Rather, McCollum interrupted the prosecutor during his opening statement. Obviously, McCollum is a party to this case. Furthermore, the court reminded the jury of this instruction after a question from a juror the next day: "As I instructed everyone yesterday, the testimony is to come from the witness stand."

{¶ 18} Upon review, we find no abuse of discretion in the trial court's jury instruction subsequent to McCollum's outburst. *See State v. Bey*, 85 Ohio St.3d 487, 500, 709 N.E.2d 484 (1999) ("[T]he judge did not need to instruct the jury to

disregard the outburst," which occurred during the mitigation phase of the sentencing hearing. "Bey created the outburst, so he may not persuasively argue that he is entitled to a mistrial or an instruction to the jury to disregard his own behavior.").

{¶ 19} Accordingly, McCollum's second assignment of error is overruled.

**B. Peremptory Jury Challenges**

{¶ 20} McCollum argues in his third assignment of error that his due process rights were violated when the trial court used "a procedure whereby the parties would exercise their peremptory challenges outside of the presence of the jury." Prior to trial, the court went on the record and stated that "the parties may use their peremptories on the entire panel as they choose." This was done outside the presence of the jury. Defense counsel objected, asking that "we allow our jury back here so we know who we are talking about as we respectfully dismiss them." The court denied counsel's request: "As to the proceedings, this is the way that the court will do the peremptory challenges."

{¶ 21} Pursuant to R.C. 2945.21, the parties in a criminal case have "the right to peremptorily challenge jurors during voir dire." *State v. Greer*, 39 Ohio St.3d 236, 245, 530 N.E.2d 382 (1988). Crim.R. 24 governs the procedure for these peremptory challenges, and subsection (E) states in part as follows: "Nothing in this rule shall limit the court's discretion to allow challenges under this * * * rule to be made outside the hearing of prospective jurors." The Staff Notes to the July 1, 2006 amendments to Crim.R. 24 state in pertinent part that this sentence was "added to

expressly afford the trial court the discretion to allow the exercise of challenges for cause and peremptory challenges outside the hearing of the jury."

{¶ 22} Upon review, we find McCollum's argument to be without merit, and his third assignment of error is overruled.

## C. Sufficiency of the Evidence

{¶ 23} In his fourth assignment of error, McCollum argues that "there was not sufficient evidence of 'prior calculation and design," and "the evidence was insufficient for the aggravated robbery and robbery convictions."

{¶ 24} "[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

### 1. Pertinent Trial Testimony

{¶ 25} In the case at hand, the following pertinent testimony was presented at trial.

{¶ 26} Michael Jones ("Michael") testified that Jessie Jones and Ernest Hill are his uncles, Marks was his cousin, and McCollum was his best friend "since we were three, four years old * * *." For the past "eight and a half, nine years," Michael has been living with his uncles on Banberry Circle, in Warrensville Heights. On July

17, 2021, Marks was also living there. According to Michael, McCollum "stayed with us for a couple of years" as well. When Marks lived there, "[h]e slept downstairs on the couch." When Marks and McCollum both stayed there, Marks would sleep on the couch, and McCollum "would make a pallet on the floor somewhere."

{¶ 27} On the night of July 17, 2021, Michael was upstairs playing a video game when he heard a gunshot, "some scuffling," and somebody saying, "shut up, shut up." Michael testified that he thought they were being robbed. At the time, he did not know who came into the house. Michael "immediately jumped out of the window[,] ran * * * across the street and * * * called the police." According to Michael, there was no shotgun in the house that night and there was no hammer "laying around downstairs" that night.

{¶ 28} Jessie Jones ("Jones") testified that he has known McCollum "[f]or years, been around the family for years." Jones testified that Marks was his nephew. Jones, Marks, Michael, and Jones's brother, Ernest Hill, were living together on July 17, 2021. That night, Jones, who was upstairs in his bedroom, heard someone banging on the back door and then heard his brother yell, "Carlos, what's wrong?" Jones next heard a gunshot. Jones went downstairs and saw McCollum "beating [Marks] with the gun." Jones tried to intervene. Marks got up, and "[h]e made it to almost the kitchen to where he collapsed."

{¶ 29} Jones ran upstairs and yelled that he was going to call the police. McCollum followed Jones upstairs. Jones heard McCollum say "you all not calling the police, give me your phones. And you know, I'm going to kill everyone in here.

* * * I've killed before and I'll kill everyone in here. * * * [L]et this guy die. I don't give a hell about him. Let him die. You're not calling the police. And give me your phone." Jones told McCollum "[N]o, I'm not giving you nothing." According to Jones, McCollum was trying to stop Jones from calling the police. Asked what McCollum said when trying to take Jones's phone, Jones testified as follows: "Give me your phone. Pointed the gun at me. Give me your phone. You all not calling anybody. But I wouldn't give it to him."

{¶ 30} Jones called the police and went back downstairs. Asked what happened next, Jones testified that McCollum "bashed [Marks's] head in with the hammer on the way out the door." Asked if McCollum said "anything to indicate why he was doing this," Jones testified that McCollum's "exact words were, he told someone that he raped me." Asked who McCollum said those words to, Jones answered, "Me and my brother." According to Jones, neither the shotgun nor the hammer that McCollum used that night was in the house before McCollum arrived.

{¶ 31} Ernest Hill ("Hill") testified that he has known McCollum "[a]bout 30 years" as "a good friend of the family * * *." Hill further testified that he is Jones's brother, and he was living with Jones on July 17, 2021. Asked what happened at their house on that night, Hill answered that McCollum "came in the house with a shotgun and he shot" Marks. Specifically, McCollum knocked on the back door, Hill let him inside, and McCollum "walked right past me and went in there where [Marks] was laying on the couch and shot him." According to Hill, Marks was asleep when McCollum shot him. McCollum then "pulled out a hammer," Marks tried to

get away, and McCollum "busted him in the back of the head."  Marks "fell over the couch, he was on his back and [McCollum] hit him in his skull with the hammer."

{¶ 32} Hill testified that he was sitting in the room and witnessed McCollum shoot Marks and bash Marks's head with a hammer.  Asked why he did not call the police, Hill testified that McCollum "took my phone."  According to Hill, McCollum said, "[G]ive me your phone."  McCollum grabbed Hill's phone from Hill's hand after McCollum shot Marks.  Hill testified that he "guessed" McCollum took his phone "so I wouldn't call the police."  According to Hill, McCollum "had a gunshot and a hammer" when he took the phone.

{¶ 33} Sean Schoger ("Off. Schoger") testified that he is a patrol officer for the Warrensville Heights Police Department.  On July 17, 2021, he and his partner responded to a "shots fired call" on Banberry Circle.  When he arrived at the scene, three other officers were already there.  The officers saw McCollum, "holding a shotgun in his hand," exit from the back door.  McCollum threw the shotgun over a chain-link fence and laid down on the ground.  McCollum had a claw hammer in the front waistband of his pants and shotgun shells in his rear pocket.

### 2. Aggravated Murder; Prior Calculation and Design

{¶ 34} McCollum first argues under his fourth assignment of error that there was insufficient evidence of prior calculation and design, which is an element of aggravated murder.

{¶ 35} R.C. 2903.01 governs aggravated murder, and it states in part as follows: "(A) No person shall purposely, and with prior calculation and design, cause

the death of another * * *." R.C. 2901.22(A) states that a "person acts purposely when it is the person's specific intention to cause a certain result * * *." The Ohio Supreme Court has held that "purpose to kill is not the same thing as prior calculation and design and does not by itself satisfy the *mens rea* element of R.C. 2903.01(A)." (Emphasis sic.) *State v. Campbell*, 90 Ohio St.3d 320, 341, 738 N.E.2d 1178 (2000).

{¶ 36} The Ohio Supreme Court has additionally held that "it is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." *State v. Taylor*, 78 Ohio St.3d 15, 20, 676 N.E.2d 82 (1997). "Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must amount to more than momentary deliberation." 1974 Committee Comment to H 511.

{¶ 37} In *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976), this court held the following:

> Some of the important factors to be examined and considered in deciding whether a homicide was committed with prior calculation and design include: whether the accused knew the victim prior to the crime, as opposed to a random meeting, and if the victim was known to him whether the relationship had been strained; whether thought and preparation were given by the accused to the weapon he used to kill and/or the site on which the homicide was to be committed as compared to no such thought or preparation; and whether the act was drawn out over a period of time as against an almost instantaneous eruption of events.

{¶ 38} More recently, this court has held that the state can show prior calculation and design in the following ways:

> (1) evidence of a preconceived plan leading up to the murder, (2) evidence of the perpetrator's encounter with the victim, including evidence necessary to infer the defendant had a preconceived notion to kill regardless of how the robbery unfolded, or (3) evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill.

*State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 75.

{¶ 39} In *State v. Wilson*, 8th Dist. Cuyahoga No. 104333, 2017-Ohio-2980, ¶ 58, this court applied the *Orr* factors to conclude that the state presented sufficient evidence of prior calculation and design. Specifically, the court noted the following evidence: "Wilson was described as entering Vance's apartment in the middle of the night, shooting Fisher and, in conjunction with Alexander, entering Vance's bedroom where she was shot nine times while she slept." *Id.* at ¶ 61.

{¶ 40} In the instant case, we find that the state presented undisputed evidence that McCollum: knew Marks, Jones, and Hill; entered the house where they lived with a shotgun and a claw hammer; knew that Marks slept on the couch; shot Marks while Marks was sleeping on this couch; and hit Marks in the head with the gun and the claw hammer.

{¶ 41} Furthermore, we find that, under *Jenkins*, 48 Ohio App.2d 99, 355 N.E.2d 825, there was evidence that the relationship between Marks and McCollum may have been strained. Specifically, Jones testified that McCollum told Jones and Hill that Marks "told somebody he raped me." McCollum brought a shotgun and a

claw hammer to the scene, which shows "thought and preparation" as to the weapons used to kill Marks. Additionally, McCollum beat Marks with the hammer after shooting him, which shows that the act was drawn out rather than instantaneous.

{¶ 42} Finally, under *Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, this evidence shows "that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill." In other words, there is undisputed evidence that McCollum went to the house on Banberry Circle that night with the intent and a plan to kill Marks, which is sufficient to show prior calculation and design.

### 3. Aggravated Robbery and Robbery

{¶ 43} McCollum next argues under the fourth assignment of error that there was insufficient evidence that he intended to commit a theft offense. Specifically, McCollum argues that he "encountered Hill and Jones during this episode * * * [and] asked them for the phones, not to permanently deprive them of ownership, but to hold them while this was all happening. There was no intent to steal the phones."

{¶ 44} R.C. 2911.01(A)(1) defines aggravated robbery in part as follows:

No person, in attempting or committing a theft offense, * * * shall * * * [h]ave a deadly weapon on or about the offender's person * * * and * * * use it * * *." R.C. 2911.02(A)(2) defines robbery in part as follows: "No person, in attempting or committing a theft offense * * * shall * * * [i]nflict * * * physical harm on another * * *.

{¶ 45} The crime of theft is defined in R.C. 2913.02(A) as follows:

No person, with purpose to deprive the owner of property * * *, shall knowingly obtain or exert control over * * * the property * * * in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

(3) By deception;

(4) By threat;

(5) By intimidation.

{¶ 46} The Ohio Supreme Court has held that, for aggravated robbery pursuant to R.C. 2911.01(A)(1), no intent beyond that required for theft need be proven. *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 40. Likewise, "R.C. 2911.02(A) predicates every robbery on the elements of a completed or an attempted 'theft offense,' which * * * include[s] the mental states of 'purpose' and 'knowingly.'" *State v. Tolliver*, 140 Ohio St.3d 420, 2014-Ohio-3744, 19 N.E.3d 870, ¶ 18, quoting R.C. 2913.02(A).

{¶ 47} Pursuant to R.C. 2901.22(A), a "person acts purposely when it is the person's specific intention to cause a certain result * * *."  Pursuant to R.C. 2901.22(B), a "person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result * * *."

{¶ 48} This court has held that there was sufficient evidence that the defendant intended to steal the victim's car when the victim "testified that the male brandished a gun and told her to get out of the car.  She further testified that she

interpreted the actions and words to mean that the male intended to steal her vehicle." *State v. Floyd*, 8th Dist. Cuyahoga No. 104376, 2017-Ohio-386, ¶ 41.

{¶ 49} In the case at hand, there is undisputed evidence that, after McCollum shot Marks, he told Jones and Hill that nobody was going to call the police. McCollum told Jones to give McCollum Jones's phone. McCollum was pointing his gun at Jones when he said this. Furthermore, McCollum told Hill to give McCollum Hill's phone, and McCollum took Hill's phone out of Hill's hand. Hill testified that McCollum had "a shotgun and a hammer" with him. In light of the foregoing, we find McCollum's argument that there was insufficient evidence he intended to steal the phones not well taken.

### 4. Identity

{¶ 50} McCollum next argues that "there was insufficient evidence of his identity as the perpetrator of the crime." In McCollum's appellate brief, there are no citations to the record or the law concerning this allegation, and no argument beyond the one quoted sentence. Pursuant to App.R. 16(A)(7), the appellant's brief shall include an "argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."

{¶ 51} Upon review, we find that McCollum's brief does not comply with App.R.16(A)(7) as to this specific argument.

{¶ 52} Accordingly, McCollum's fourth assignment of error is overruled.

### D. Manifest Weight of the Evidence

{¶ 53} A manifest weight of the evidence challenge "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 54} The entire argument section under McCollum's fifth assignment of error in his appellate brief follows: "For the reasons stated in the previous assignment of error regarding sufficiency, the convictions were also against the manifest weight of the evidence. The jury lost its way when it convicted Williams of these crimes. Williams will not reiterate his arguments in regards to each charge."

{¶ 55} Assuming without deciding that "Williams" refers to McCollum, we overrule his fifth assignment of error for the reasons stated in the previous assignment of error regarding sufficiency. *See also* App.R. 16(A)(7).

### E. Constitutionality of Reagan Tokes Act

{¶ 56} McCollum's sixth and final assignment of error is overruled pursuant to this court's en banc decision in *State v. Delvallie,* 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.).

{¶ 57} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

SEAN C. GALLAGHER, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR

N.B. The author of this opinion is constrained to apply *Delvallie.* For a full explanation, *see State v. Delvallie,* 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.) (Forbes, J., dissenting).