[Cite as *State v. Wade*, 2026-Ohio-2183.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff- Appellee, | : | No. 115581 |
| v. | : | |
| MARK WADE, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 11, 2026

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-696429-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristin M. Karkutt, Assistant Prosecuting Attorney, *for appellee.*

Susan J. Moran and Michael T. Fisher, *for appellant.*

MICHELLE J. SHEEHAN, A.J.:

{¶ 1} In June 2025, a jury found defendant-appellant Mark Wade ("Wade") guilty of murdering his girlfriend Angela Carner ("Carner"). Throughout these proceedings, Wade has maintained that he acted in self-defense during the

altercation that resulted in Carner's death. Wade appeals his convictions for murder, felonious assault, and other related crimes, raising the following three assignments of error:

> (1) The trial court erred by admitting hearsay statements of the decedent which violated Mr. Wade's right to Confront Witnesses Against Him, and his Right to Due Process of law, as guaranteed by the 6th and 14th Amendments to the United States Constitution, and Article 1, Section 10 of the Ohio Constitution.

> (2) The trial court erred in refusing to instruct the jury on the self-defense definitions of "residence" and "dwelling" in derogation of Mr. Wade's Right to Due Process of law, as protected by the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Sections [sic] 16 of the Ohio Constitution.

> (3) Mr. Wade's convictions are against the manifest weight of the evidence because the State did not produce evidence to dispute his self-defense claim, in violation of his Right to Due Process of law, as protected by the Fifth and Fourteenth Amendments to the United States Constitution, and Article 1, Sections [sic] 16 of the Ohio Constitution.

{¶ 2} After our independent and thorough review of the record, we affirm Wade's convictions. Specifically, we find that the statements made by Carner to her friend Diana Tellis ("Tellis") regarding her plan to leave Wade were admissible as an exception to hearsay under Evid.R. 803(3) and, further, as nontestimonial statements, their admission did not violate Wade's due process rights under the Confrontation Clause of the United States Constitution. The trial court also did not abuse its discretion in failing to instruct the jury regarding the definitions of "residence" or "dwelling" because it was undisputed that the altercation between Wade and Carner occurred in their shared residence. Thus, these definitions were

neither relevant nor material to a dispositive issue in this case. Last, we find that the State met its burden of persuasion regarding its obligation to refute Wade's claim of self-defense beyond a reasonable doubt. Therefore, Wade's convictions were not against the manifest weight of the evidence. Assignments of error Nos. 1–3 are overruled.

**Statement of Facts**

### Wade's Testimony on Direct

{¶ 3} Wade testified that he and Carner had been in a relationship for approximately three years. They were living together at his house in Cleveland. He stated that their relationship had "its ups and downs" and that they "broke up about every other week but always got back together."

{¶ 4} One weekend in October 2024, Carner went to Las Vegas. On Monday morning, Wade picked Carner up from the airport around 9:30 a.m. They went home. When Carner was in their bedroom, she noticed that Wade's "black Stacy Adams shoes" were out. According to Wade, this suggested to Carner that he had been unfaithful and she started yelling and screaming at him.

{¶ 5} In response, Wade decided to leave the house, returning home at approximately 6:00 p.m. that evening. When he returned, Carner was there and started talking about the shoes again, so Wade left and went to Dave's Supermarket. While he was there, Carner called him, asking him where he was. He told her he was at Dave's Supermarket, so she sent him a grocery list. She also texted, "[D]on't get her anything." Wade decided not to return home for a few more hours.

{¶ 6} Wade returned home at 10:00 p.m. Carner was in the living room watching TV. Wade put away the groceries and went to watch TV in the bedroom.

{¶ 7} At approximately 3:30 a.m., Wade testified that he was woken up by Carner yelling his name. He went to the living room. Wade testified that Carner was sitting on the couch with a gun and a knife in front of her on the living room table.

{¶ 8} Wade described the blade of the knife as "at least 12 inches." He recognized the knife as being from his kitchen. He identified the gun as a Glock .45. Wade testified that the gun was not his and he did not recognize it. Wade later testified that Carner had a gun that she kept in her truck while working.

{¶ 9} Wade testified that Carner yelled at him and picked up the gun. Wade lunged and grabbed the barrel of the gun, pointing it up towards the ceiling and pulling the gun out of her hand.

{¶ 10} While he still had possession of the gun, Wade testified that he then started to back up toward the first-floor bedroom adjacent to the living room. Carner then got up off the couch with the knife. Wade pointed the gun at her and told her "not to do it." Carner, however, came toward Wade holding the knife. Wade shot the gun twice, hitting Carner.

{¶ 11} Carner fell back onto the couch. But she then got back up. Wade testified in response that he "just started firing" until he saw her drop the knife. Wade testified as follows:

Q. How many times did you fire the gun?

A. I don't know.  I fired the — I fired it until she dropped the knife.

Q. Why did you pull the trigger of that gun, sir?

A. Because I was scared.

Q. About what, sir?

A. She was going to stab me.  If I let her get anywhere near me with that knife, I would have got hurt.

Trial tr. 608.  Wade further testified:

Q. Now, at 3:30 in the morning, when she went for that gun, what was your thought process at that point in time?

A. Oh, I was scared.

Q. Why would you be scared of this woman that you had known for some period of time?

A. Because she had violent tendencies.

Q. When she picked up that gun, what did you think was going to happen to you?

A. I thought I was going to get shot.

Q. What, if anything, did you do again to get that gun from her?

A. I pulled it out of her hand.  I grabbed it, I pointed the barrel towards the ceiling.

Q. When you got control of the gun, what did Ms. Carner do?

A. Once she was sitting back on the couch, she grabbed a knife.  And she got back up and was coming at me with the knife.

Q. And how did you feel about that, sir?

A. I was definitely scared.

Q. What were you scared of, sir?

A. Getting hit with that knife.

Q. What would that have done?

A. Caused serious damage.  I could have got killed.

Q. Were you fearful of that?

A. Yes.  Definitely.  Definitely fearful.

Q. Why?

A. Because a knife is a dangerous weapon.

Q. Well, you had a gun?

A. A gun compared to a knife, sometimes a gun — I mean, a knife is way worse than a gun.

Q. Okay.  And you said you shot twice?

A. Yeah, initially, I shot twice.  And she sat back down.  Then she got back up, even after getting shot twice.

Q. What was her demeanor at that point in time when she got back up?

A. Oh, she was still in rage mode.  She was still in rage mode.

Q. Was she coming at you with that knife?

A. Yes, she was.

Q. What, if anything, did you do, sir?

A. I started firing.

Q. Were you fearful of Ms. Carner at that particular point in time?

A. Oh, most definitely.

Q. Scared that you were going to die at that time?

A. Yes, I could have.

Q. That was your reason that you fired that gun?

A. Yes, it was. That's the only reason I fired that gun.

Q. And you have no idea how many times you fired that gun?

A. No.

Trial tr. 619-621.

{¶ 12} Wade then testified that Carner was lying on the couch. She had turned around and slid down the couch until her knees were on the ground. He then "started just crying my eyes out. You know, just in shock." He knew she was dead. Wade did not call 9-1-1. He covered her body with a blanket and laid down.

{¶ 13} Wade woke up the next morning. He did not call the police. He did not call EMS. He testified that he was "trying to get some type of plan or something" and that he "was basically stalling for time."

{¶ 14} That same morning, Wade took Carner's cellphone to Five Star Trucking where she was expected to show up for her work as a truck driver. Wade hid her cellphone down a grassy area by her truck so people would think she was at work. He testified that he "needed some more time to figure out what I was going to do." Wade further testified that when asked by Five Star employees, and later the police, if he knew where Carner was, he told them that he had taken Carner to work in the morning.

{¶ 15} The next day following the altercation, Wade still had not called police and Carner was still on the couch in the house. He went to work briefly. Then Wade went to Home Depot and purchased a garbage can. Then he went back to work briefly.

{¶ 16} Wade testified that the police called him and then pulled him over while he was driving around. The police took him to his house, and Wade told the police that Carner was in the house. The police entered the house and discovered Carner's body.

{¶ 17} At this point, Wade testified that he told the police where to find the knife. Wade stated that he put it back in the kitchen. Wade further testified that he got rid of the gun by taking it apart and tossing it "at 72nd."

**The State's Evidence**

{¶ 18} During its cross-examination of Wade and presentation of its case, the State introduced testimony and evidence regarding (1) the volatile and sometimes physically abusive relationship between Wade and Carner; (2) Carner's intention to leave Wade; (3) Wade's efforts to cover up his crime; and (4) the investigation, medical examination, and forensic results from the crime scene and Carner's autopsy.

**Wade and Carner's Relationship**

{¶ 19} On Wade's cross-examination, the State introduced a police report filed by Carner in February 2024. As a result of this report, Wade was charged with assaulting Carner. Carner went to the hospital because of her injuries. Wade

testified that Carner started their fight and hit him on the head, causing a scar. According to Wade, the assault case was dismissed because Carner told the prosecutor that she started the fight. The State introduced several text messages between Wade and Carner showing that Wade was making threats toward Carner to prevent her from testifying. Wade denied these texts were threats.

{¶ 20} The State introduced several more texts unrelated to the assault case but also showing threats made by Wade toward Carner, including one stating he would "empty a clip off in [her] mother blank a**" and another threatening to "kill" her.

**Carner's Intent to Leave Wade**

{¶ 21} Tellis, a longtime friend of Carner's, testified that she and Carner went to Las Vegas for the weekend prior to the altercation. Tellis testified that Carner was going to leave Wade when they returned from Las Vegas. Carner's daughter also testified that Carner and Wade would break up often.

**Wade's Efforts to Cover Up His Crime**

{¶ 22} The State presented testimony from two employees from Five Star Trucking and Carner's sister and daughter that detailed their actions once they discovered that Carner was missing. Specifically, the Five Star Trucking employees testified regarding Carner not showing up for work on Tuesday morning and their review of video footage showing Wade arriving on the property, walking around Carner's truck, and then leaving the property. They also testified regarding their discovery of Carner's cell phone and their decision to call the Willoughby police.

{¶ 23} Carner's sister testified that when she did not hear from Carner she called Wade to ask about her and he replied that he took her to her truck stop. Carner's daughter also testified that she called Wade to ask about her mother and he told her that he took her to work. Carner's daughter further testified that Carner hated guns and did not own one.

{¶ 24} Lieutenant Greig from the Willoughby Police Department responded to the Five Star Trucking employees' call and located Carner's cellphone. He also testified that he called Wade to inquire about Carner's location. Wade responded that he took her to work and that she was "going through" some stuff.

{¶ 25} The police officers and crime scene detectives who arrived at Wade's house each testified regarding the presence of a large trash can next to Carner's body. Detective Powell testified regarding Wade's purchase of the garbage can from Home Depot on the afternoon after Carner's death. He confirmed the surveillance video from Home Deport showing Wade purchase the garbage can. When questioned by the State regarding the trash can, Wade testified:

> Q. Now, sir, a few moments ago, when [the defense attorney] was asking you some questions, you made sure to tell us that you didn't touch the body or anything, because you knew forensics were going to show up, right?
>
> A. Yes.
>
> Q. Because you just didn't have enough time to get her into that garbage can to get rid of her, right?
>
> A. That was a thought. I did not actually do that, though, did I?
>
> Q. You just didn't get around to it?

A. I had a whole day and a half if that's what I wanted to do.

Q. You had a lot of things to do in that day and a half.

A. I think that one would have been most important.

Trial tr. 632.

{¶ 26} The State further questioned Wade regarding his failure to tell police that he was acting in self-defense as follows:

Q. And when Detective Crivel first talked to you, I mean, he offered you an opportunity to explain what happened, right?

A. Yes, he did.

Q. And you said no, she's going to pop up.  Right?

A. Yes, she did.

Q. Well, she was decomposing in your living room?

A. It was only a day.

Q. Only a day?  Only a day?

A. I could see if it was five days or something, then that's when you see decomposing.

Q. Well, you heard the medical examiner testify.  And he said, Gee, did it get physical?  She sounds like she might be violent.  And you said, No.  Nothing physical happened.  And in fact, when he met you in person, you rolled up your sleeves and you showed him.  Do you remember that?

A. Yes, I do.

Q. So even given the opportunity during those phone conversations, you never said, Hey, Detective Crivel, you know what, you're right.  I acted in self-defense, and I did what I had to do.  You didn't say that to him, did you?

A. No. I said I would come in the morning, though.

Q. Because the morning was going to buy you more time to put her in the trash can and get her out of your living room, right?

A. No.

Q. No?

A. No.

Q. And it's not until the police are about to walk in your door, when you tell them that they're going to find what they're looking for, right?

A. Right.

Trial tr. 636-637.

### The Investigation, Medical Examination, and Forensic Results From the Crime Scene and Carner's Autopsy

{¶ 27} The responding police officers and crime scene detectives generally testified regarding the small size of the living room, that it was cluttered, contained oversized furniture, and had a large living room table, which all would make it difficult to have a struggle consistent with Wade's claims. They also each testified that there was no sign of a struggle at the scene. They also confirmed the presence of the large garbage can next to Carner's body that was partially covered with a blanket. They further confirmed that there was no gun or knife found at the scene.

{¶ 28} The medical examiner and forensic team testified that Carner had 11 gunshot wounds. Six of the gunshot wounds entered through her back. Several of the gunshot wounds were made at close range, between 1 to 5 feet. They also

testified that further testing was not possible because they did not have the gun or knife.

{¶ 29} Carner's toxicology report revealed that she had both alcohol and cocaine in her body at the time of death. The amount of alcohol was under the legal limit. The cocaine results demonstrated that there was a low amount of cocaine and it had not been ingested immediately prior to her death because the test revealed that the cocaine showed signs of being metabolized.

**Procedural Facts**

{¶ 30} The indictment charged Wade with the following: murder in violation of R.C. 2903.02(A); murder in violation of R.C. 2903.02(B); felonious assault in violation of R.C. 2903.11(A)(2); felonious assault in violation of R.C. 2903.11(A)(1); domestic violence in violation of R.C. 2919.25(A); and tampering with evidence in violation of R.C. 2921.12(A)(1). All counts included firearm specifications under R.C. 2941.141(A) and 2941.145(A). Wade pled not guilty to all charges and subsequently filed his required notice of self-defense under Crim.R. 12.2.

{¶ 31} The case proceeded to a trial by jury on all counts except the domestic-violence count, which was determined by the trial court. The jury and trial court returned verdicts of guilty on all counts. Wade was sentenced to 21 years to life in prison. This appeal follows.

**Law and Analysis**

**Assignment of Error No. 1 — Hearsay and the Confrontation Clause**

{¶ 32} Wade's first assignment of error alleges that the trial court erred in admitting the statements made by Carner to her longtime friend Tellis during their trip to Las Vegas. These statements related to Carner's plan to end her relationship with Wade upon their return from Las Vegas. Wade argues that these statements were inadmissible hearsay and violated his due process rights under the Confrontation Clause of the Sixth Amendment of the United States Constitution. In response, the State argues that the statements, while hearsay, were admissible under the "then existing, mental, emotional, or physical condition" exception to hearsay memorialized in Evid.R. 803(3). Additionally, the State argues that because the statements were nontestimonial, the Confrontation Clause was neither implicated nor violated by their admission. Based on the well-established law below, we find this assignment of error not well-taken.

**Hearsay**

{¶ 33} We will first address whether the statements are inadmissible hearsay. Generally, "'a trial court has broad discretion regarding the admission of evidence, including whether evidence constitutes hearsay and whether it is admissible hearsay.'" *State v. Edmond*, 2026-Ohio-561, ¶ 33 (8th Dist.), quoting *In re A.M.*, 2022-Ohio-612, ¶ 22 (8th Dist.). Thus, "we 'will not disturb a trial court's decision regarding the admissibility of hearsay evidence absent an abuse of

discretion.'" *Id.*, quoting *In re A.M.* at ¶ 22, citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984). An abuse of discretion is defined as "a court exercising its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 34} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, hearsay statements are inadmissible unless the statement comes in under a recognized exception. *State v. Campbell*, 2014-Ohio-493, ¶ 44 (8th Dist.); Evid.R. 802-807. The exception raised here is Evid.R. 803(3) which provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . .
>
> (3) Then existing, mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The Ohio Supreme Court has consistently interpreted this hearsay exception to permit the introduction of statements made by an unavailable declarant regarding their intent or plan to end, terminate, or otherwise leave a relationship. *State v. Leonard*, 2004-Ohio-6235, ¶ 100; *State v. O'Neal*, 87 Ohio St.3d 402, 411 (2000); *State v. Sage*, 31 Ohio St.3d 173, 182-183 (1997). We have followed this binding

precedent.  *See, e.g., State v. Young*, 2001 Ohio App. LEXIS 1700, * 10 (8th Dist. Apr. 12, 2001); *see also State v. Jenkins*, 2007-Ohio-4227, ¶ 36 (11th Dist.).

{¶ 35} Based on our review of the record and applying the above precedent, we find that the trial court did not abuse its discretion in permitting Tellis to testify regarding Carner's plans to end her relationship with Wade.  These statements, while hearsay, fall under the exception to hearsay under Evid.R. 803(3) — then existing, mental, emotional, or physical condition.  Therefore, they were properly admitted by the trial court.

{¶ 36} Further, we are unpersuaded by Wade's arguments that the trial court impermissibly permitted Tellis to testify regarding why Carner planned to leave Wade.  While he is correct that the exception to hearsay under Evid.R. 803(3) does not permit introduction of statements regarding why a declarant intends to end a relationship, the record does not demonstrate that Tellis testified regarding any statements made by Carner in this regard.  In fact, the record shows that when Tellis testified regarding the abusive nature of Wade and Carner's relationship, the trial court struck her comment from the record.  Notably, Tellis did not testify that this was the reason Carner was ending the relationship.  The record does not contain any other testimony from Tellis regarding statements made by Carner detailing her reasons for ending the relationship.  Finally, to the extent any curative instruction was necessary (and we do not believe that it was), the responsibility was on defense counsel to request one and not the State as suggested in Wade's briefing.  *See*

*generally State v. Allen*, 1993 Ohio App. LEXIS 4392, * 76 (8th Dist. Sept. 9, 1993), citing *State v. Davis*, 62 Ohio St.3d 326, 339 (1991).

**Confrontation Clause**

{¶ 37} Next, we must consider whether the trial court's admission of these statements violated Wade's due process rights under the Confrontation Clause. That is, "[w]henever the state seeks to introduce hearsay into a criminal proceeding, the court must determine not only whether the evidence fits within an exception, but also whether the introduction of such evidence offends an accused's right to confront witnesses against him." *State v. Powell*, 2019-Ohio-4345, ¶ 38 (8th Dist.). An appellate court reviews whether a defendant's rights under the Confrontation Clause have been violated under a de novo standard of review. *State v. Crawford*, 2022-Ohio-2673, ¶ 43 (8th Dist.).

{¶ 38} Generally referred to as the "Confrontation Clause," the Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The United States Supreme Court determined in *Crawford v. Washington*, 541 U.S. 36 (2004), that the Confrontation Clause bars the admission of "testimonial statements of witnesses absent from trial." *Id.* at 59. The Court concluded that "where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69.

{¶ 39} In contrast, *Crawford* does not bar the admission of hearsay statements that are nontestimonial. *Davis v. Washington*, 547 U.S. 813, 823 (2006); *State v. Siler*, 2007-Ohio-5637, ¶ 21. Simply put, if the subject statements are nontestimonial, the Confrontation Clause is not implicated. *Whorton v. Bockting*, 549 U.S. 406, 420 (2007). While *Crawford* did not define "testimonial," it did state that the Confrontation Clause is implicated when statements are "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford* at 52.

{¶ 40} The statements at issue in this matter occurred between longtime friends while on a vacation to Las Vegas. Consequently, we find that Carner's statements to Tellis that she planned to leave Wade upon their return home were not testimonial. In other words, these statements were not made under circumstances that would lead an objective witness to reasonably believe that the statement would be available for use at a later trial. Courts addressing statements made between friends and family members have reached the same conclusion. *See, e.g., State v. Carter*, 2018-Ohio-3671, ¶ 39 (8th Dist.); *State v. Cook*, 2007-Ohio-625, ¶ 17 (8th Dist.); *State v. Ray*, 2010-Ohio-2348, ¶ 43-44 (8th Dist.); *State v. Peeples*, 2009-Ohio-1198, ¶ 29-31 (7th Dist.); *United States v. Franklin*, 415 F.3d 537, 545 (6th Cir. 2005). Because the statements between Carner and Tellis were nontestimonial, the Confrontation Clause is not implicated and Wade's due process rights thereunder were not violated by their admission at trial.

{¶ 41} Assignment of error No. 1 is not well taken and is overruled.

**Assignment of Error No. 2 — Jury Instructions**

{¶ 42} Under this assignment of error, Wade argues that the trial court abused its discretion by failing to include the definitions of "dwelling" or "residence" as requested by defense counsel in the jury instructions. Wade contends that these definitions were necessary to his self-defense claim to establish he had "no duty to retreat." In contrast, the State argues that the trial court did not abuse its discretion by not including these definitions because it was undisputed that the parties' altercation took place in Wade's shared residence with Carner. Therefore, whether Wade had a duty to retreat was not an issue raised by the facts of this case and the requested definitions were not material to the case. For the following reasons, we agree with the State and overrule Wade's second assignment of error.

**Standard of Review**

{¶ 43} We review a "trial court's decision to provide or not provide specific jury instructions under an abuse of discretion standard." *State v. Coates*, 2025-Ohio-5340, ¶ 83 (8th Dist.), citing *State v. Guster*, 66 Ohio St.2d 266, 271 (1981). Specifically, we review the trial court's decision regarding jury instructions for an "'abuse of discretion under the facts and circumstances of the case.'" *State v. McCollum,* 2023-Ohio-69, ¶ 16 (8th Dist.), quoting *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). Stated otherwise, "trial courts have discretion whether to give requested jury instructions 'based on the dispositive issues presented at trial,' and we review the court's decision for abuse of discretion." *Becker v. Direct Energy, LP*, 2018-Ohio-4134, ¶ 76 (2d Dist.), quoting *Renfro v. Black*, 52 Ohio St.3d 27, 30

(1990). "An abuse of discretion occurs when a court exercises its judgment 'in an unwarranted way in regard to a matter over which it has discretionary authority.'" *Coates* at ¶ 83, quoting *Abdullah*, 2021-Ohio-3304, at ¶ 35.

**Jury Instructions**

{¶ 44} In general, "[a] criminal defendant has the right to expect that the trial court will give complete jury instructions on all issues raised by the evidence." *State v. Mackey*, 1999 Ohio App. LEXIS 5902, * 24 (8th Dist. Dec. 9, 1999), citing *State v. Williford*, 49 Ohio St.3d 247, 251 (1990). "Jury instructions should be tailored to fit the facts of each case." *Mackey* at *24, citing *Avon Lake v. Anderson*, 10 Ohio App.3d 297, 299 (9th Dist. 1983). Parties are only entitled to jury instructions "pertinent" to "material issues." *State v. Elliott*, 2014-Ohio-4958, ¶ 23 (2d Dist.), citing *State v. Guster*, 66 Ohio St.2d 266, 269 (1981). "It is within the sound discretion of the trial court to refuse to admit proposed jury instructions which are either redundant or immaterial to the case." *Bostic v. Connor*, 37 Ohio St.3d 144 (1988), paragraph two of the syllabus.

**Analysis**

{¶ 45} Based on our review of the record and the authority above, we find that the trial court did not abuse its discretion by failing to include the definitions of "residence" or "dwelling" in the jury instructions. While we recognize that the affirmative defense of self-defense generally requires a defendant to demonstrate that they had "no duty to retreat," and that this element can be established by

evidence that the defendant was in one's own home, we find that the location of the incident is not in dispute in this case and therefore immaterial to its resolution.

{¶ 46} Specifically, the record demonstrates — and the parties do not dispute — that the incident between Carner and Wade occurred in their shared residence. In other words, whether the incident took place in a residence or dwelling is neither pertinent nor material to the issues raised in this case. *See State v. Hilliard*, 2017-Ohio-2952, ¶ 11 (1st Dist.) (finding no error in trial court's failure to define residence or dwelling in the jury instructions because the location of the altercation was "never disputed" and thus these definitions were "unnecessary"). Accordingly, the trial court did not abuse its discretion in declining to include these definitions in the jury instructions.

{¶ 47} Assignment of error No. 2 is overruled.

**Assignment of Error No. 3 — Manifest Weight of the Evidence**

{¶ 48} In his final assignment of error, Wade challenges the weight of the evidence supporting his convictions. Specifically, Wade argues that the State failed to meet its burden of persuasion in rebutting his self-defense claim. After a thorough review of the record, we conclude that Wade's convictions were not against the manifest weight of the evidence. Assignment of error No. 3 is overruled.

**Self-Defense and a Manifest-Weight Standard**

{¶ 49} "A person may use deadly force in self-defense where he or she (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or

her only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger." *State v. Davis*, 2025-Ohio-5412, ¶ 39 (8th Dist.), citing *State v. Messenger*, 2022-Ohio-4562, ¶ 14, citing *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). The burden is on the State "to prove beyond a reasonable doubt that a defendant did not use the force in self-defense." *State v. Davidson-Dixon*, 2021-Ohio-1485, ¶ 18 (8th Dist.). To satisfy its burden, the State must only disprove one of the elements of self-defense. *Id.*; *see also State v. Gardner*, 2022-Ohio-381, ¶ 24 (8th Dist.).

{¶ 50} A self-defense claim is properly reviewed under a manifest-weight standard. *Gardner* at ¶ 22. A manifest-weight analysis requires us to "'look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflict in the evidence, the trier of fact clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Davis* at ¶ 36 (8th Dist.), quoting *State v. Spencer*, 2024-Ohio-5809, ¶ 26 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 – 387 (1997). We will reverse on manifest weight "'"only in the exceptional case in which the evidence weighs heavily against the conviction."'" *Id.* at ¶ 37, quoting *State v. McLoyd*, 2023-Ohio-4306, ¶ 40 (8th Dist.), quoting *Thompkins* at 387.

{¶ 51} "'Self-defense claims are generally an issue of credibility.'" *Gardner* at ¶ 26, quoting *State v. Walker,* 2021-Ohio-2037, ¶ 13 (8th Dist.). "'Whether the state disproves any of the elements of self-defense is left to the

trier of fact to decide.'" *Id.*, quoting *Davidson-Dixon* at ¶ 36, citing *State v. Morton*, 2002-Ohio-813, ¶ 52 (8th Dist.). "'The jury may take note of any inconsistencies and resolve them accordingly, 'believ[ing] all, part, or none of a witness's testimony.'" *State v. Sheline*, 2019-Ohio-528, ¶ 96 (8th Dist.), quoting *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.). "Nor is a conviction against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over the defendant's." *State v. Wells*, 2021-Ohio-2585, ¶ 40 (8th Dist.), citing *State v. Williams*, 2018-Ohio-3368, ¶ 67 (8th Dist.).

{¶ 52} It is also well-established that "'[p]roof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *State v. Rodano*, 2017-Ohio-1034, ¶ 35 (8th Dist.), quoting *State v. Zadar*, 2011-Ohio-1060, ¶ 18 (8th Dist.). "'Although circumstantial evidence and direct evidence have obvious differences, those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence.'" *State v. Dodson,* 2025-Ohio-1733, ¶ 14 (8th Dist.), quoting *State v. Wilborn*, 2024-Ohio-5003, ¶ 38 (8th Dist.), citing *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.). Further, circumstantial evidence ""may also be more certain, satisfying, and persuasive than direct evidence."" *Id.*, quoting *State v. Hawthorne*, 2011-Ohio-6078, ¶ 9 (8th Dist.), quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960).

**Analysis**

{¶ 53} Based on the record and these guiding principles, we find that the jury could have reasonably concluded that the State successfully rebutted beyond a reasonable doubt either of the first two elements of Wade's self-defense claim. This is not the case where the trier of fact clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered, but rather it is a case where the jury chose to believe the State's version of events over the defendant's. Indeed, the State introduced ample evidence demonstrating Wade's lack of credibility and, consequently, the truth of his version of events. Wade's failure to call 9-1-1 immediately following the altercation and his undisputed efforts to hide or delay discovery of Carner's body are particularly troubling. Similarly, Wade's removal of the knife and destruction of the gun also weigh heavily against his claims of self-defense. Consequently, Wade's convictions are not against the manifest weight of the evidence. Assignment of error No. 3 is overruled.

{¶ 54} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, ADMINISTRATIVE JUDGE

EILEEN A. GALLAGHER, J., and
TIMOTHY W. CLARY, J., CONCUR